UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

PAUL W. BRADEN,

Petitioner,

v.

CHRISTINA PFEIFFER, Warden,

Respondent.

Case No. 16-cv-05997-JST (PR)

**ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS; GRANTINGCERTIFICATE OF APPEALABILITY**

Before the Court is the above-titled petition for a writ of habeas corpus, filed pursuant to 28 U.S.C. § 2254 by petitioner Paul W. Braden, challenging the validity of a judgment obtained against him in state court. Respondent has filed an answer to the petition. Petitioner has not filed a traverse, and the time in which to do so has passed. For the reasons set forth below, the petition is denied.

## I.  PROCEDURAL HISTORY

On December 12, 2011, the Lake County District Attorney filed an information charging petitioner and co-defendant Orlando Lopez with: first degree murder (Cal. Penal Code, § 187(a); count 1);[1] six counts of assault with a firearm (§ 245(a)(2); counts 2, 4, 7, 10, 12, 14); five counts of attempted murder (§§ 664, 187(a); counts 3, 6, 9, 11, 13); two counts of mayhem (§ 203; counts 5, 8); and discharging a firearm at an inhabited dwelling (§ 246; count 15). The information alleged that petitioner had personally discharged a firearm causing great bodily injury or death (§ 12022.53(d); counts 1-15), personally discharged a firearm (§ 12022.53(c); counts 1, 3, 5, 6, 8, 9, 11, 13), personally used a firearm (§§ 12022.5(a), 12022.53(b); counts 1-14), and inflicted great bodily injury (§ 12022.7(a), (d); counts 2-4, 6, 9-14), and that he had served a prior prison term (§ 667.5(b)).  Ex. 1 at 168-82 (ECF No. 18-1 at 184-98).[2]  The trial court ordered a consolidated trial

---

[1] All further statutory references are to the California Penal Code, unless otherwise specified.
[2] All references herein to exhibits are to the exhibits submitted by respondent in support of the

with separate juries for petitioner and Lopez.[3]

On June 20, 2012, petitioner's jury found him guilty on all counts and found all the special allegations true. Ex. 1 at 541-69, 657-58 (ECF No. 18-2 at 259-87, 18-3 at 104-05). Petitioner admitted having served a prior prison term. Ex. 1 at 658 (ECF No. 18-3 at 105). On August 9, 2012, the trial court sentenced petitioner to 312 years to life in prison. Ex. 1 at 703-06 (ECF No. 18-3 at 116-25).

On February 17, 2016, the California Court of Appeal reversed petitioner's first degree murder conviction pursuant to People v. Chiu, 59 Cal. 4th 155 (2014). Ex. 15 at 12-18 (ECF No. 18-34 at 13-19). The court permitted the State to "elect to accept a reduction of the convictions to second degree murder or to retry the greater offense" absent the theory of liability barred by Chiu. Ex. 15 at 18 (ECF No. 18-34 at 19)[4] The state appellate court also ordered that the sentences imposed for mayhem be stayed, but otherwise affirmed the judgment and sentence. Ex. 15 at 53-54, 56 (ECF No. 18-34 at 54-55, 57). On May 25, 2016, the California Supreme Court denied review. Ex. 17 (ECF No. 18-36).

The instant petition was filed on October 17, 2016.

## II.    STATEMENT OF FACTS

The following summary describing the crime and evidence presented at trial is from the opinion of the California Court of Appeal:[5]

### *The June 2011 Fight At Graduation*

---

answer, unless otherwise indicated.

[3] A third man, Kevin Stone, had also been charged with these offenses. He pleaded no contest to lesser offenses and testified against petitioner and Lopez. *See* Ex. 3 at 2499-2501 (ECF No. 18-20 at 7-9).

[4] Respondent represents that the State chose to accept reduction of petitioner's conviction to second degree murder. ECF No. 17-1 at 11, n.3.

[5] The Court has independently reviewed the record as required by AEDPA. Nasby v. McDaniel, 853 F.3d 1049, 1055 (9th Cir. 2017). Based on the Court's independent review, the Court finds that it can reasonably conclude that the state court's summary of facts is supported by the record and that this summary is therefore entitled to a presumption of correctness, unless otherwise indicated in this order. Hernandez v. Small, 282 F.3d 1132, 1135 n.1 (9th Cir. 2002); 28 U.S.C. § 2254(e)(1).

On June 10, 2011, Josh Gamble attended a graduation ceremony at Lower Lake High School with his friend Joseph Armijo. At the time, Gamble was 17 and Armijo was 15. A group of youths known as the "Avenue Boyz" approached Gamble and Armijo as they sat in the bleachers. One member of the group, Dennis Fry, stepped on Gamble's shoe and said, "What's up, bitch." Fry and Gamble had had a conflict prior to that date. After the ceremony, Gamble and Armijo sat outside, either talking to other kids or waiting to fight Fry. The Avenue Boyz and Leonardo Lopez (the brother of [codefendant] Lopez) approached. Fry and Gamble exchanged words, then Leonardo Lopez hit Gamble in the face without warning, with either his fist or a lead pipe. Gamble sustained an injury under his right eye. The two groups scuffled, then separated.

A few days later, Desiree Kirby was with Gamble's sister Amanda at a store. Kirby's boyfriend, Ross Sparks, is Josh and Amanda Gamble's cousin. Kirby and Amanda Gamble had heard about the graduation fight. They saw Leonardo Lopez and Fry at the store and there was a confrontation. They yelled at each other angrily. Fry said "it would happen again." The store staff made them all leave.

### Events at Ashli Athas's House On June 18, 2011

Ashli Athas was Leonardo Lopez's girlfriend, and they had an infant. In June 2011, they lived with Athas's grandmother on 16th Avenue in Clearlake. In the afternoon or early evening on June 18, people started arriving at the house for a party. The guests included some of the Avenue Boyz and appellants Lopez and Braden. Braden was a tall man with a shaved head. "Nano" is Lopez's nickname.

At some point during the party, Athas heard Braden arguing on the phone with Crystal Pearls and Ross Sparks; Pearls is aunt to both Athas and Sparks. Braden said, "Let's meet up and handle this." Other witnesses saw Lopez and Braden yelling and arguing on the phone; they were passing the phone back and forth. Leonardo Lopez heard Braden threaten someone, "I'll kill you." One witness testified Lopez was angry, yelling, and "trying to schedule somewhere to go to fight." The witness asked Lopez who he was speaking to, and Lopez responded "bitch ass Ross Sparks." A group was discussing the possibility of meeting up with Ross Sparks for a fight, and Braden said, "we can meet him . . . and you guys can start fighting, I'll be hiding in the bushes and I can pop out and start shooting them." Lopez was present, but still on the phone at the time.

Braden said he could have a gun delivered, and about 10 to 15 minutes later Lopez and Braden left the party together. When they returned, Braden was carrying a black shotgun wrapped in a sweatshirt or sweater and a plastic bag containing shotgun shells. Braden said he wanted to saw off the butt of the shotgun, and Leonardo Lopez said he could use the garage. Braden went to a workbench in the garage and began sawing off the butt of the shotgun. Lopez was standing either next to Braden or close by at the entrance to the garage. One witness testified Lopez was holding the barrel of the gun.

Subsequently, Braden sat on the patio stairs popping shells in and out of the

3

shotgun. He said, "I didn't bring this gun to Clearlake for nothing, let's go use it. I didn't go get it for no reason." Several times he also said, "I'm bored, let's go shoot somebody." At the time, Lopez was standing on the patio on his phone. Another witness heard Braden say, "What the fuck, I didn't bring my gun for nothing, we need to go do this." The same witness also heard Braden say that, "since no one would go meet them," he wanted to "[w]alk down to Ross's house and start shooting them." At the time, Lopez was "sitting a ways away."

At around 9:30 or 10:00 p.m., Athas's grandmother told everyone to go home. Lopez and Braden left between 10:15 and 10:30 p.m.; Kevin Stone picked them up in a car. Athas testified that Braden carried the shotgun wrapped in a sweatshirt, but Lopez was not holding anything.

### The June 18 Backyard Barbecue

In June 2011, Desiree Kirby lived in an apartment building on Lakeshore Drive in Clearlake with Ross Sparks and their two children, Skyler and Eden. Skyler was four years old.[6] Their yard was separated from their neighbor Curtis Eeds's yard by a six-foot-tall wooden fence. The fence had a hole where two boards were missing. There was also a notch at the top of the fence where a piece of board was missing; there was a washing machine in Eeds's yard behind that spot.

On June 17, 2011, Lopez had unexpectedly stopped by Eeds's place. Sparks was there, and he and Lopez talked about the graduation fight. Sparks told Lopez, "your brother's got one coming." Lopez said he would handle his brother and not to worry about it.

Sparks and Kirby held a barbecue on June 18, 2011, the same day as the party at Athas's place. The guests included Ross's brother Andrew Sparks, Josh Gamble, Amanda Gamble, Joseph Armijo, Ian Griffith, and Crystal Pearls, among others. That day, Ross Sparks received a number of threatening texts and phone calls. A text at 7:20 p.m. said, "Let's go toes at oak hill u ready." A second text from the same number said, "Its nano im fuck u up u fuckn punk fuck your life." Sparks responded: "Really nano this is Ross and if u want problems you know my family ain't one to fuck with this shit will get real crazy if u want." Sparks sent another message stating, "Shit will get handled." Another incoming message said, "Come c me rite n0w." Sparks replied, "If this is how its gonna be over some punk shit then I guess well all bump into one another." Further incoming messages said, "Im on my way u at hOme" and "Were ya at." Sparks replied, "At my house." An incoming response said, "K meet me at tha water park if a man."

At some point in the middle of the texting Ross Sparks called the number the texts had come from and recognized Lopez's voice on the other end. Lopez told Sparks he would "bash" Sparks and his family with the same lead pipe Leonardo Lopez had used to hit Josh Gamble. Lopez and Sparks exchanged a few texts and calls after that; Lopez was mad because Sparks would not come and meet him. Other

---

[6] Ross Sparks testified that Skyler Rapp was his stepson. Ex. 3 at 1550 (ECF No. 18-16 at 120).

people saw Sparks on the phone, angry, yelling, and saying that he was willing to fight. Josh Gamble heard him say, "You're going to come and do it, then do it." Kirby heard Sparks tell a caller he would "beat their ass." The last phone call with Lopez was around 7:42 p.m.

Crystal Pearls testified that at around 3 p.m. on June 18th Sparks called her and asked her to come over to his house because there was going to be an altercation to settle a dispute that had started at the high school. She saw Sparks on the phone arguing with Lopez. At one point, Pearls had the phone, and she spoke to someone whose voice she did not recognize who told her, "I'm going to come there, we're going to—I'll kill you, I'll kill your family. I don't give a fuck who you are." He also said he was going to come and "shoot up" her whole family. After Pearls hung up, a friend of hers called Lopez's number, spoke to Lopez, and learned that Braden was the person Pearls had spoken to. Pearls left the barbecue before the shooting.

### The June 18 Shooting

Around 10:30 to 10:45 p.m., the partygoers in Sparks and Kirby's yard heard a big boom or gunshot from the wooden fence separating the yard from Eeds's yard. Ross Sparks, who was facing the fence, testified the shot came from the hole in the fence and it sounded like a shotgun. He then saw muzzle flashes from a second shooter firing over a portion of the top of the fence where a notch is missing; he testified the shooter must have been kneeling on the washer at that location on the Eeds's side of the fence. Other witnesses also described seeing muzzle flashes from those two locations.

Ross Sparks could only see by the light of the muzzle flash the silhouette of a person kneeling and aiming through the hole in the fence. As for the shooter at the top of the fence, he could only see the silhouette of a head; the shooter did not have long hair. It was "really dark" over there. Josh Gamble testified the shooter at the top of the fence was at least six feet tall and had short hair. Andrew Sparks also testified that shooter had short hair. The shooter at the hole in the fence was almost six feet tall and it looked like he had a shotgun. It was even darker at the hole in the fence than at the top of the fence where the second shooter was.

Josh Gamble testified that the firearm at the hole in the fence made a "boom" sound and the other made a "pap, pap, like a firecracker." He had "no doubt" they sounded different. He thought the person at the hole had a shotgun; he couldn't tell what type of firearm the person at the top of the fence had. Ross Sparks also testified the gunshots sounded different; one was a "big booming sound" and the other was a "lower sounding shot." He opined it could have been two shotguns with different types of shot. Ian Griffith testified the first shot was loudest and the subsequent shots had "more pop." At one point in his testimony, Andrew Sparks testified the weapons sounded "real similar" and he thought both were shotguns. At another point in his testimony he testified the shots from the different locations sounded different; he opined it was because different types of rounds were used.

Ross Sparks testified he saw four or five shots fired from the hole in the fence and

5

two or three fired from the top of the fence; because of the rate of fire, he thought the shooter at the hole had a semiautomatic weapon. The entire period of shooting lasted about five seconds. Andrew Sparks saw about three muzzle flashes from the top of the fence, and three or four from the hole in the fence; on cross-examination he stated that he heard six or seven shots but only saw three muzzle flashes. Joseph Armijo heard more than two shots, but fewer than ten. Ian Griffith heard 13 or 14 shots total. Amanda Gamble heard six or seven shots total, over the space of three minutes.

Skyler Rapp was killed in the shooting. Desiree Kirby, Andrew Sparks, Joseph Armijo, Ian Griffith, and Amanda Gamble were all hit by the shots, and suffered injuries of varying severity.[7]

Clearlake Police Department Sergeant Martin Snyder responded to the scene of the shooting for evidence collection. He observed holes in the residence consistent with damage from 9–shot and 15–shot buckshot. One shotgun could have fired both types of rounds. Sergeant Snyder recovered three shotgun shell casings. A criminalist could not identify the shells as having been fired from the same weapon but opined they had been "cycled" (loaded and ejected) through the same weapon.

### Events After the Shooting

Some time after midnight on the night of the shooting, Stone's girlfriend Leighann Painchaud received a text from him saying, "I love you, I'm sorry, but we can't be together." Painchaud communicated with Stone two or three weeks after the shooting. She met him in Santa Rosa at the end of June; Stone was scared and overwhelmed. Stone and Painchaud were arrested in Santa Rosa.

Braden called Leonardo Lopez's cell phone the morning after the shooting, and Athas answered. Athas, who was related to Skyler Rapp, said to Braden, "You know that was like my cousin that you killed." Braden responded, "Oh my God, I'm sorry. Oh my God." Athas then hung up.

Anthony Gaston, one of the Avenue Boyz, testified that around June 14 he had stashed a borrowed single-shot shotgun between boxes on the porch at Athas's place. Lopez saw the shotgun when Gaston brought it over and saw where it was hidden. Gaston saw the shotgun on the afternoon of the June 18th party, but did not see it again after that. Gaston later heard from Leonardo Lopez that the weapon had been used and was no longer at Athas's place. At trial, Leonardo Lopez denied Gaston's testimony about the shotgun.

### Kevin Stone's Testimony

Appellant Stone testified against Lopez and Braden as part of Stone's plea bargain. He said he was testifying because he did not want to be blamed for the shootings,

---

[7] Though not noted by the California Court of Appeal, the record shows that Ross Sparks was also shot. Ex. 3 at 1597-98 (ECF No. 18-16 at 167-68).

because he wanted to help put Braden in prison, and to "save my own ass really." Stone admitted that at the time of the shooting he had been addicted to methamphetamine for eight years, was using a very large amount every day, and sold the drug to support his habit. He had also traded drugs for guns.

On June 18, Stone's girlfriend Painchaud borrowed a car from her cousin so they could go purchase some methamphetamine. Stone was also texting with Lopez that day. Lopez asked Stone in a text whether Stone was interested in "pulling a lick," which meant getting something for free, including by a robbery. Lopez texted, "I got a lick and I got the straps and everything." A "strap" meant a firearm. Stone told Lopez he would pick Lopez up.

Painchaud drove to Leonardo Lopez' s place. Lopez and Braden approached the car; Braden was holding a shotgun, and Lopez was carrying something "similar" that Stone thought was another shotgun. Braden was wearing gloves and a rag over the lower portion of his face. Painchaud drove the men back to her apartment and gave the car key to Stone. Stone retrieved a .22–caliber rifle from Painchaud's apartment. Either Lopez or Braden told Stone to drive to Curtis Eeds's place. Braden told Stone he should drive more carefully because Braden was "wanted for murder." Stone asked a couple of times what the "lick" was, and Braden told him, "it's a good lick, don't trip." Stone had recently ripped Eeds off by giving him fake drugs in exchange for cash, and he thought they were going to do something similar again.

Stone parked and the men went into Eeds's yard. Lopez was in the lead, followed by Braden and then Stone. Stone could hear a party on the other side of a fence. Stone was not looking at Braden or Lopez when he heard the first shotgun blast. He looked up and saw Braden shooting his shotgun over the fence into the party. Stone watched Braden aim and shoot "about three times;" he heard five or six shots total. Stone saw Lopez standing still and looking at Braden; he did not see Lopez fire his weapon. He believed the other shots he heard came from Braden. Stone said he was "very certain" Lopez was not shooting.

Stone and Lopez ran back to the car; Stone said Lopez jumped in it at the same time he did and Braden followed moments later. Lopez was shaken up, while Braden was calm. Stone sped off and eventually crashed the car into some bushes. The men got out, discarding their weapons into foliage along the way.

At trial, Lopez impeached Stone's testimony with testimony from Valentin Aguilar, who was in jail with Stone. Stone was "real sad" while talking about his case. Stone said Lopez wanted a ride, so Stone went to pick him up. Stone retrieved a gun and suggested they rob Eeds. Braden had a shotgun, but Lopez had no weapon. When they arrived at Eeds' place, Braden thought Eeds was in the neighboring yard. Stone put his gun over the fence and fired once into the ground and once into the air; he did not hit anyone. Braden fired several times towards the people on the other side of the fence. Stone told Aguilar he had lied about Lopez being armed because Lopez had said that Stone had been armed. Aguilar had shared a cell with Lopez for a week, but he did not talk with Lopez about the case.

In the People's rebuttal, Stone denied telling Aguilar that he had fired his rifle, and he reaffirmed his testimony that Lopez had a shotgun on June 18.

***Evidence Presented Only to Braden's Jury***

Clearlake Police Department Detective Sergeant Thomas Clements contacted appellant Braden at Braden's father's house and interviewed him twice on June 20, 2011. Recordings of the interviews were played to Braden's jury. Braden said his father picked him up after the party at Athas's house on June 18; Lopez was not present at the party. He denied knowing Stone and denied being present at the shooting.

Sergeant Clements testified he spoke with Braden's father on September 21, 2011, and Braden's father said he would not have gone to pick up Braden because he took medication between 8:00 and 9:00 p.m. and would not have driven after that.

An informant, Daniel Loyd, testified he met Braden while the two of them were in jail. He did not receive any deal in exchange for his testimony. On September 29, 2011, Braden said he "blasted Rapp's little boy and the other motherfuckers that had it coming...." Braden "was bragging about how he was going to get away with shooting a little boy." Braden told Loyd that Stone and Lopez had called and asked for help retaliating for "somebody [who] had been beaten down." Braden brought a shotgun, which he modified by sawing off the butt and some of the barrel. The three of them drove to a residence in a van and "started blasting over the fence." Braden said he gathered up the shells and stashed the firearms, although he was upset that one of his codefendants had thrown "a .22" out the window as they fled.

On a couple of occasions, Braden asked if Loyd wanted to buy marijuana and guns, or if Loyd knew someone who did. Braden said he sold a lot of guns to gang members. Braden also said he could escape jail with Loyd by beating a correctional officer, stealing her key, and getting to a car he would have waiting. Braden said he sent someone to scare one of the witnesses, probably Athas, and he talked about having some of the witnesses in the case killed.

***Evidence Presented Only to Lopez's Jury***

Sergeant Clements interviewed Lopez on June 28; a recording of the interview was played to Lopez's jury. Lopez said he had been at Athas's house with Braden. He saw Braden saw the butt off a black shotgun and wrap up the end with duct tape. Braden had been "talking shit" to Ross Sparks and talking about "shooting up the house." Braden also was telling people at Athas's place, "I wanna shoot somebody."

Lopez said that Stone picked him and Braden up; Stone's girlfriend was driving. They went to an apartment, and Stone retrieved a gun and returned without his girlfriend. Braden had his shotgun. Braden and Stone were talking about robbing someone but Lopez did not think they were serious. They arrived at Eeds's house and Braden walked up to the fence and started shooting.

People v. Lopez, No. A136253, 2016 WL 634651, at *2-7 (Cal. Ct. App. Feb. 17, 2016) (footnotes omitted).

## III.    DISCUSSION

### A.    Standard of Review

A petition for a writ of habeas corpus is governed by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA").  This Court may entertain a petition for a writ of habeas corpus "in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States."  28 U.S.C. § 2254(a).

A district court may not grant a petition challenging a state conviction or sentence on the basis of a claim that was reviewed on the merits in state court unless the state courts' adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d); Williams v. Taylor, 529 U.S. 362, 412-13 (2000).  Additionally, habeas relief is warranted only if the constitutional error at issue "'had substantial and injurious effect or influence in determining the jury's verdict.'"  Penry v. Johnson, 532 U.S. 782, 795 (2001) (quoting Brecht v. Abrahamson, 507 U.S. 619, 637 (1993)).

A state court decision is "contrary to" clearly established Supreme Court precedent if it "applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases," or if it "confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a result different from [its] precedent."  Williams, 529 U.S. at 405-06.  "Under the 'unreasonable application' clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case."  Id. at 413.  "[A] federal habeas court may not issue the writ simply because that court concludes in its

United States District Court
Northern District of California

independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." Id. at 411.

Section 2254(d)(1) restricts the source of clearly established law to the Supreme Court's jurisprudence. "[C]learly established Federal law, as determined by the Supreme Court of the United States," refers to "the holdings, as opposed to the dicta, of [the Supreme] Court's decisions as of the time of the relevant state-court decision." Williams, 529 U.S. at 412. "A federal court may not overrule a state court for simply holding a view different from its own, when the precedent from [the Supreme Court] is, at best, ambiguous." Mitchell v. Esparza, 540 U.S. 12, 17 (2003).

Here, as noted, the California Supreme Court summarily denied petitioner's petition for review. The court of appeal, in its opinion on direct review, addressed eight of the claims petitioner raises in the instant petition. The court of appeal thus was the highest court to have reviewed those claims in a reasoned decision, and it is the court of appeal's decision that this Court reviews herein. See Wilson v. Sellers, No. 16-6855, slip op. at 2 (U.S. Apr. 17, 2018); Barker v. Fleming, 423 F.3d 1085, 1091-92 (9th Cir. 2005); Cannedy v. Adams, 706 F.3d 1148, 1156 (9th Cir. 2013). An additional claim, Claim 1, was presented only in the petition for review to the California Supreme Court and not in the direct appeal. When presented with a state court decision that is unaccompanied by a rationale for its conclusions, a federal court must conduct an independent review of the record to determine whether the state court decision is objectively reasonable. See Delgado v. Lewis, 223 F.3d 976, 982 (9th Cir. 2000). This "[i]ndependent review . . . is not de novo review of the constitutional issue, but rather, the only method by which [a federal court] can determine whether a silent state court decision is objectively unreasonable." See Himes v. Thompson, 336 F.3d 848, 853 (9th Cir. 2003). "Where a state court's decision is unaccompanied by an explanation, the habeas petitioner's burden still must be met by showing there was no reasonable basis for the state court to deny relief." See Harrington v. Richter, 502 U.S. 86, 98 (2011).

**B.      Petitioner's Claims**

Petitioner asserts the following grounds for relief: (1) it was error for the state appellate

court to allow his murder conviction to be reduced to second degree rather than order a new trial;
(2) his joint trial with Lopez violated his rights to due process and a fair trial; (3) the trial court
erred in denying his motion for a mistrial; (4) the trial court erred in failing to instruct the jury that
accomplice testimony requires corroboration; (5) the trial court erred in failing to instruct the jury
with CALCRIM No. 357 on adoptive admissions, or his trial counsel rendered ineffective
assistance of counsel by failing to request the instruction; (6) the trial court erred in failing to
instruct on how to evaluate evidence of uncharged acts, or he was denied effective assistance of
counsel by trial counsel's failure to request such an instruction; (7) the trial court erred by failing
to instruct the jury with CALCRIM No. 336 on the corroboration requirement for in-custody
informant testimony; (8) the trial court erred in its instruction to the jury on the specific intent
required for the "kill zone" theory of attempted murder; (9) the cumulative prejudice from the
above errors amounted to denial of due process and a fair trial; and (10) there was insufficient
evidence to support the firearm enhancements. The Court addresses these claims in turn.

### 1.      Reduction of Conviction

Petitioner claims that it was error under the Sixth and Fourteenth Amendments for the state
appellate court to allow the reduction of his murder conviction to second degree, and he asserts
that he is entitled to a new trial. ECF No. 1 at 10. Petitioner presented this same claim to the
California Supreme Court in his petition for review. The California Supreme Court's rejection of
the claim was not objectively unreasonable. Petitioner's conviction was reversed under People v.
Chiu, 59 Cal. 4th 155 (2014), on the ground that the jury may have relied on an improper theory
when finding that he murdered Skyler Rapp willfully, deliberately, and with premeditation as
required for first degree murder. In Chiu, the California Supreme Court held that "an aider and
abettor may not be convicted of first degree premeditated murder under the natural and probable
consequences doctrine. Rather, his or her liability for that crime must be based on direct aiding
and abetting principles." Chiu, 59 Cal. 4th at 158-59. The appellate court reversed petitioner's
conviction because it could not conclude that the jury had relied on the permissible theory that
petitioner was the direct perpetrator of the murder or direct aider and abettor versus the
impermissible theory that the murder was a natural and probable consequence of petitioner's

aiding and abetting an assault.  <u>People v. Lopez</u>, 2016 WL 634651, at *10-11.

Even had the jury based its first degree murder conviction on a legally invalid theory, however, the improper theory could have had no impact on the other facts as found by the jury, which support a conviction for second degree murder.  <u>See</u> Cal. Penal Code § 189 (defining first and second degree murder).  Petitioner does not contend otherwise.  In such circumstances, allowing the State to choose between retrying petitioner or reducing his conviction to murder in the second degree was appropriate.  <u>See, e.g.</u>, <u>Lujan v. Garcia</u>, 734 F.3d 917, 934-35 (9th Cir. 2013) (granting conditional habeas writ allowing state to reduce murder conviction to second degree).

Petitioner relies on <u>Taylor v. Cate</u>, 772 F.3d 842 (9th Cir. 2014).  <u>See</u> ECF No. 1 at 10.  As he acknowledges, however, <u>Taylor</u> is not citable authority because the case was reheard en banc.  <u>See</u> <u>Taylor v. Beard</u>, 811 F.3d 326 (9th Cir. 2016) (en banc) (<u>Taylor II</u>).  As explained in <u>Taylor II</u>, Taylor was one of two men who killed Lewis Lim.  <u>Id.</u> at 327.  After a jury found Taylor was the shooter, he was sentenced to life without parole.  <u>Id.</u>  Thereafter, Taylor convinced the State that although he had been present at the shooting, his cousin had been the actual shooter.  <u>Id.</u>  "Though its subsequent attempt to prosecute the [cousin] as the actual shooter was unsuccessful, the State still supported an effort to have Taylor's sentence reduced to the shorter term that would apply to him if convicted as an aider and abettor and not as the actual shooter.  That effort was ultimately successful, and Taylor was resentenced to a term of imprisonment with the possibility of parole."  <u>Id.</u>  Taylor objected, contending that his conviction should be set aside entirely.  At his trial, the jury had been given instructions on felony murder under both an aiding and abetting theory as well as under the theory that he was the shooter.  Taylor "argued that the jury's finding that he was the shooter meant it had not found him guilty of felony murder on a theory of aiding and abetting as the person who accompanied the shooter."  <u>Id.</u>

On de novo review, the Ninth Circuit rejected Taylor's argument.  <u>See</u> 811 F.3d at 331. The court held that the evidence did not establish Taylor's innocence of aiding and abetting the murder.  <u>Id.</u> at 332-34.  Further, the court held that even if "the jury relied solely on the theory that he was the shooter," Taylor's claim became "nothing more than a freestanding actual innocence

claim" that he could not support.  Id. at 334.

Petitioner's reliance on Taylor fails because the reasoning upon which he relies was rejected by the en banc court.  Further, here the evidence does not establish petitioner's innocence of second degree murder – to the contrary, there was strong evidence that he murdered Skyler Rapp.

Accordingly, petitioner is not entitled to habeas relief on this claim.

### 2.    Consolidated Trial

Petitioner claims that his rights to a fair trial and due process were violated by his joint trial with Lopez.  ECF No. 1 at 11-13.  The California Court of Appeal summarized and rejected this claim as follows:

> Section 1098 [of the California Penal Code] provides in relevant part, "When two or more defendants are jointly charged with any public offense, whether felony or misdemeanor, they must be tried jointly, unless the court order separate trials."  In the present case, the prosecutor moved in November 2011 to consolidate the trials of all three defendants.  Lopez opposed consolidation on the ground that the prosecutor's intent to introduce Braden's pretrial statements raised concerns under *People v. Aranda* (1965) 63 Cal.2d 518 (*Aranda*) and *Bruton v. United States* (1968) 391 U.S. 123 (*Bruton*), which relate to the prejudice arising from admission at a joint trial of a prior statement of one defendant that inculpates a codefendant.  Braden joined Lopez's opposition.  The trial court acknowledged the *Aranda-Bruton* issue, but noted that the defendants "face virtually identical charges and allegations.  Even if the strategy of one defendant is to present evidence placing responsibility on another defendant, all of the damaging evidence admissible in a joint trial would likely also be admissible in a separate trial as to any defendant."  The court ruled that Lopez and Braden would be tried jointly with separate juries; at the time of the ruling, Stone had decided to enter a guilty plea.

> On appeal, Braden contends that consolidation of his trial with that of Lopez was prejudicial error.  We review the trial court's consolidation order "for abuse of discretion based upon the facts as they appeared when the court ruled on the motion."  (*People v. Burney* (2009) 47 Cal.4th 203, 237 (*Burney*).)  "'If the court's joinder ruling was proper at the time it was made, a reviewing court may reverse a judgment only on a showing that joinder "'resulted in "gross unfairness" amounting to a denial of due process.'"'" (*People v. Letner and Tobin* (2010) 50 Cal.4th 99, 150 (*Letner*).)

> Braden first argues consolidation should have been denied due to the likelihood he would be prejudiced by association with Lopez because the evidence at the preliminary hearing showed "the case against [Braden] was far weaker than that against Lopez."  "A prejudicial association justifying severance will involve

circumstances in which the evidence regarding one defendant might make it likely the jury would convict that defendant of the charges and, further, more likely find a codefendant guilty based upon the relationship between the two rather than upon the evidence separately implicating the codefendant." (*Letner, supra*, 50 Cal.4th at p. 152.)  We reject Braden's claim because the preliminary hearing disclosed substantial evidence separately implicating Braden.  It is true the evidence at that stage indicated Lopez had a clearer motive for the shooting, and there was an eyewitness – Sparks's neighbor – who saw Lopez at Sparks's fence firing a shotgun. Nevertheless, the neighbor also saw Braden at the fence.  Moreover, there was testimony at the preliminary hearing that on the afternoon of the shooting Braden threatened to beat Pearls during a phone call, retrieved a shotgun which he modified by sawing off part of the barrel, and stated he wanted to shoot somebody.  Finally, Braden failed to deny participating in the shooting in a phone call the next day.  Braden's claim based on prejudicial association fails.

Braden also argues his trial should have been severed because his defense that he was not present conflicted with Lopez's defense that he was present but did not shoot into Sparks's backyard.  Severance is only warranted for conflicting defenses "when the conflict between the defendants alone will demonstrate to the jury that they are guilty.  If, instead, 'there exists sufficient independent evidence against the moving defendant, it is not the conflict alone that demonstrates his or her guilt, and antagonistic defenses do not compel severance.'" (*Letner*, 50 Cal.4th at p. 150.)  In the present case, substantial independent evidence implicated Braden in the shootings.

Finally, Braden appears to contend that joinder resulted in gross unfairness denying his right to due process (*Letner, supra*, 50 Cal.4th at p. 150) because Clearlake Police Sergeant Tim Celli testified at trial that Lopez admitted being present at the scene of the shooting and indicated that Braden was in the car as well.  As explained below (Part VI, *post*)[8], that evidence was stricken and the jury was instructed to disregard it.  In any event, that testimony did not result in gross unfairness because other witnesses, including Stone and his girlfriend, placed Braden in the car and/or at the scene of the shooting.  Neither has Braden shown gross unfairness resulted from any other aspect of the joint trial.

People v. Lopez, 2016 WL 634651, at *19-20 (footnotes omitted).

A joinder, or denial of severance, of co-defendants or counts may prejudice a defendant sufficiently to render his trial fundamentally unfair in violation of due process.  Grisby v. Blodgett, 130 F.3d 365, 370 (9th Cir. 1997).  A federal court reviewing a state conviction under 28 U.S.C. § 2254 does not concern itself with state law governing severance or joinder in state trials.  Id. at 370.  Nor is it concerned with the procedural right to severance afforded in federal trials.  Id.; see Collins v. Runnels, 603 F.3d 1127, 1131-32 (9th Cir. 2010) (finding that Supreme Court

---

[8] Referring to Claim 3, below.

decisions addressing severance under federal rules do not apply to analysis of whether joinder in state courts was constitutional). The federal court's inquiry is limited to whether the petitioner received a fair trial under the United States Constitution. Grisby, 130 F.3d at 370. To prevail, therefore, the petitioner must demonstrate that the state court's joinder or denial of his severance motion resulted in prejudice great enough to render his trial fundamentally unfair. Id. In addition, the impermissible joinder must have had "a substantial and injurious effect or influence in determining the jury's verdict." Sandoval v. Calderon, 241 F.3d 765, 772 (9th Cir. 2000).

"[T]here is no clearly established federal law requiring severance of criminal trials in state court even when the defendants assert mutually antagonistic defenses." Runningeagle v. Ryan, 686 F.3d 758, 774 (9th Cir. 2012) (rejecting ineffective assistance of counsel claim premised on counsel's failure to join co-defendant's motion to sever); see also Collins, 603 F.3d at 1132-33 (holding that Zafiro v. United States, 506 U.S. 534 (1993) and United States v. Lane, 474 U.S. 438 (1986), which analyzed severance under the Federal Rules of Criminal Procedure, did not clearly establish a constitutional standard upon which habeas relief may be granted under AEDPA).

Based on a review of the record, and applying these legal principles to petitioner's current allegations, the state court's rejection of this claim was not contrary to, and did not involve an unreasonable application of, Supreme Court precedent, and was not based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. 28 U.S.C. § 2254(d). Petitioner has not shown that the joinder of counts and refusal to sever were so prejudicial that they rendered his trial fundamentally unfair. Further, as noted by the California Court of Appeal, there was abundant evidence incriminating petitioner, apart from any conflict between the defenses.

Accordingly, petitioner is not entitled to habeas relief on this claim.

### 3. Denial of Motion for Mistrial

Petitioner claims he was denied his "Sixth Amendment right to confront witnesses when the trial court denied [his] mistrial motion" after the jury heard Sergeant Celli testify to a statement made by Lopez. ECF No. 1 at 14-16. The California Court of Appeal summarized and rejected this claim as follows:

As noted previously, the trial court ordered separate juries for Braden and Lopez to address the risk of prejudice arising from admission at the joint trial of a prior statement of one defendant inculpating the other. (*See Aranda, supra*, 63 Cal.2d 518; *Bruton, supra*, 391 U.S. 123.) Nevertheless, at trial on April 26, 2012, in front of both juries, Clearlake Police Sergeant Tim Celli testified, in response to questions from the prosecutor, regarding a prior statement made by Lopez that incriminated Braden. On appeal, Braden contends the trial court erred in denying his mistrial motion relating to the testimony. We disagree.

### A. Background

In the relevant portion of his testimony, Sergeant Celli testified he detained Lopez days after the shooting and advised Lopez of his *Miranda* rights. Although Lopez initially denied involvement in the shooting, he eventually admitted he was present but claimed he did not shoot anybody. Celli continued, "Lopez essentially told me that he was in the passenger—a passenger in the vehicle, Paul Braden was seated behind him, directly behind him, Kevin Stone was the driver of the vehicle...." At that point in the testimony, Braden's counsel objected on the basis of *Aranda*, and the trial court sustained the objection. After a recess, Braden's counsel indicated his intent to file a written motion regarding the testimony, and the trial court released the jury until May 2, 2012. On April 30, Braden filed a motion for mistrial based on the *Aranda-Bruton* violation and prosecutorial misconduct. The prosecutor argued the error in admitting the evidence of Lopez's statement was harmless in light of other evidence—some not yet presented—that Braden was with Lopez and Stone in the car the night of the shooting. The court deferred ruling on the mistrial motion and ordered the jury to return on May 9, in part because "someone [on the jury] has lost a family member and there's a funeral tomorrow."

On May 9, 2012, the trial court read the following admonition to Braden's jury: "During the most recent time that you were present for testimony on April 26, 2012, questions were asked of Officer Tim Celli of the Clearlake Police Department. Objections were made and were sustained. The Court has determined that the questions were improper and orders the testimony stricken from the record. You are to disregard the testimony you heard from Officer Celli. [¶] You are not to speculate as to why that testimony was stricken or what other answers he may have given had he continued to testify. When the Court orders testimony stricken from the record, you may not consider it in any way. You are to treat it as though you had never heard it." After the close of evidence, the court denied the mistrial motion and again admonished the Braden jury, as follows: "At one point in this trial you heard testimony from Sergeant Tim Celli of the Clearlake Police Department about a statement or statements made by defendant Orlando Lopez. Those statements were stricken from the record and you were instructed to disregard them. [¶] I again instruct you to disregard any testimony from Sergeant Celli as to statements made by Orlando Lopez. You are to treat any such statements as if you had never heard them."

### B. Analysis

Braden contends the trial court erred in denying his mistrial motion because the

trial court's admonishments were inadequate to cure the prejudice in Braden's jury hearing Lopez's prior statement that Braden was in a car with Lopez and Stone the night of the shooting. "'"A mistrial should be granted if the court is apprised of prejudice that it judges incurable by admonition or instruction. [Citation.] Whether a particular incident is incurably prejudicial is by its nature a speculative matter, and the trial court is vested with considerable discretion in ruling on mistrial motions."'" [Citation.] Accordingly, '[w]e review a trial court's denial of a motion for mistrial for abuse of discretion.'" (*People v. Lightsey* (2012) 54 Cal.4th 668, 718 (*Lightsey*).)

In arguing that the trial court's admonishments were inadequate, Braden emphasizes that Lopez's prior statement was the first evidence that directly connected Braden with the shooting. He also points out that the trial court did not give the admonition until May 9, 2012—two weeks after the objectionable testimony. (See *People v. Pigage* (2003) 112 Cal.App.4th 1359, 1375 ["a timely admonition from the court generally cures any harm"] (emphasis added).) Finally, he argues the testimony was especially prejudicial because the statement directly implicated him in the shooting. The United States Supreme Court has indicated that admonishments are less effective at curing the prejudice from expressly incriminating prior statements by codefendants because they are "more vivid than inferential incrimination, and hence more difficult to thrust out of mind." (*Richardson v. Marsh* (2003) 481 U.S. 200, 208.)

The trial court did not abuse its discretion. Braden's jury only heard that Lopez denied shooting the victims and he was in a car with Braden and Stone at some point, presumably the evening of the shooting. There was already testimony from two witnesses that Lopez and Braden were picked up by Stone the night of the shooting, and, as the prosecutor promised, Stone's girlfriend testified later in the trial that she and Stone picked up Lopez and Braden the night of the shooting. Although the court did not admonish the jury not to consider Sergeant Celli's testimony for two weeks—delay which resulted from Braden's motion for mistrial and the death of a juror's family member—there was no additional testimony between Braden's original objection and the admonishment. Under the circumstances, the jury would have understood there was a problem with Celli's testimony and there is no reason to believe the delay in providing an admonishment rendered it ineffective. Braden does not suggest the language of the admonishment was inadequate, and the trial court again admonished the jury at the end of the trial. (See *People v. Avila* (2006) 38 Cal.4th 491, 575 ["assuming [the codefendant's] extrajudicial statement about defendant incriminated defendant, it did not prejudice defendant because the court admonished the jury not to consider it for any purpose against defendant, and we presume the jury followed the instruction"].) There is no basis to reject the trial court's finding that the objectionable testimony was not "incurably prejudicial." (*Lightsey, supra*, 54 Cal.4th at p. 718.)

People v. Lopez, 2016 WL 634651, at *21-22 (footnotes omitted).

A defendant is deprived of his Sixth Amendment right of confrontation when a facially incriminating confession of a nontestifying codefendant is introduced at their joint trial, even if the

jury is instructed to consider the confession only against the codefendant. See <u>Bruton v. United States</u>, 391 U.S. 123, 126, 135-36 (1968). A statement is not facially incriminating merely because it identifies a defendant; the statement must also have a "sufficiently devastating or powerful inculpatory impact to be incriminatory on its face." <u>United States v. Olano</u>, 62 F.3d 1180, 1195 (9th Cir. 1995). Confrontation Clause claims are subject to harmless error analysis. <u>United States v. Nielsen</u>, 371 F.3d 574, 581 (9th Cir. 2004). In the context of reviewing a state court conviction under 28 U.S.C. § 2254, this of course means that relief is in order only if the admission at issue "had substantial and injurious effect or influence in determining the jury's verdict." <u>Brecht v. Abrahamson</u>, 507 U.S. 619, 623 (1993).

Based on a review of the record, and applying these legal principles to petitioner's current allegations, the state court's rejection of this claim was not contrary to, and did not involve an unreasonable application of, Supreme Court precedent, and was not based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. 28 U.S.C. § 2254(d). First, the California Court of Appeal reasonably found that the challenged statement did not facially incriminate petitioner because, at most, the statement only indicated that Lopez and Braden were in a car together at some point. Further, the California Court of Appeal reasonably found any error to be harmless in light of the admonishments given to the jury and in light of the strength of the evidence showing petitioner's guilt, including independent evidence that Braden was in the car with Lopez on the night of the shooting.

Accordingly, petitioner is not entitled to habeas relief on this claim.

### 4. Jury Instruction on Corroboration of Accomplice Testimony

Petitioner claims that the trial court's failure to instruct the jury that accomplice statements require corroboration violated his right to due process. ECF No. 1 at 17. The California Court of Appeal summarized and rejected this claim as follows:

> Section 1111 [of the California Penal Code] provides: "A conviction cannot be had upon the testimony of an accomplice unless it be corroborated by such other evidence as shall tend to connect the defendant with the commission of the offense; and the corroboration is not sufficient if it merely shows the commission of the offense or the circumstances thereof. [¶] An accomplice is hereby defined as one who is liable to prosecution for the identical offense charged against the defendant

on trial in the cause in which the testimony of the accomplice is given." "Section 1111 codifies common law concerns about the reliability of accomplice testimony. [Citation.] '[S]uch testimony has been legislatively determined never to be sufficiently trustworthy to establish guilt beyond a reasonable doubt unless corroborated.'" (*People v. Gonzales and Soliz* (2011) 52 Cal.4th 254, 303 (*Gonzales*).) The underlying rationale is that "an accomplice has a natural incentive to minimize his own guilt before the jury and to enlarge that of his cohorts." (*People v. Brown* (2003) 31 Cal.4th 518, 555.) The parties agree Stone was an accomplice of Lopez and Braden and the trial court erred in failing to properly instruct the jury regarding corroboration. (*People v. Tobias* (2001) 25 Cal.4th 327, 331 ["'[w]hen there is sufficient evidence that a witness is an accomplice, the trial court is required on its own motion to instruct the jury on the principles governing the law of accomplices,' including the need for corroboration"].)

### A. The Missing Instructions

The parties agree the trial court should have instructed the jury pursuant to CALCRIM Nos. 334 or 335[21] that it could not convict Lopez and Braden based on Stone's testimony alone and that it could use Stone's testimony to convict only if (1) Stone's testimony "is supported by other evidence that you believe," (2) the supporting evidence is "independent" of Stone's testimony, and (3) "[t]hat supporting evidence tends to connect the defendant to the commission of the crime[s]." The instruction would have further informed the jury that, "Supporting evidence, however, may be slight. It does not need to be enough, by itself, to prove that the defendant is guilty of the charged crime[s], and it does not need to support every fact [mentioned by Stone in his testimony]. On the other hand, it is not enough if the supporting evidence merely shows that a crime was committed or the circumstances of its commission. The supporting evidence must tend to connect the defendant to the commission of the crime." (CALCRIM Nos. 334, 335.) Finally, the instruction would have directed the jury that "Any [testimony] of an accomplice that tends to incriminate the defendant should be viewed with caution. You may not, however, arbitrarily disregard it. You should give that [testimony] the weight you think it deserves after examining it with care and caution and in the light of all the other evidence." (*Ibid.*)

The trial court also erred in failing to modify CALCRIM No. 301, which was given without modification: "The testimony of only one witness can prove any fact. Before you conclude that the testimony of one witness proves a fact, you should carefully review all the evidence." However, the trial court should have added a proviso reminding the jury that Stone's testimony required supporting evidence. (*People v. Chavez* (1985) 39 Cal.3d 823, 831-832.)

### B. Harmless Error Analysis

"'A trial court's failure to instruct on accomplice liability under section 1111 is harmless if there is sufficient corroborating evidence in the record.' [Citation.] 'Corroborating evidence may be slight, may be entirely circumstantial, and need not be sufficient to establish every element of the charged offense.' [Citation.] The

evidence is 'sufficient if it tends to connect the defendant with the crime in such a way as to satisfy the jury that the accomplice is telling the truth.' [Citation.]" (*Gonzales*, *supra*, 52 Cal.4th at p. 303; see also *People v. McDermott* (2002) 28 Cal.4th 946, 985 (*McDermott*).) Where there is sufficient corroboration in the record, we need not consider whether it is reasonably probable the result would have been more favorable had the jury been properly instructed. (*Gonzales*, at pp. 304-305; see *People v. Watson* (1956) 46 Cal.2d 818, 836.) We need only engage in that analysis where sufficient corroboration is absent. (*Gonzales*, at p. 304.)

In the present case, there was ample corroboration of Stone's testimony that appellant Braden shot a shotgun over the fence into Sparks' backyard. Among other things, Braden threatened Crystal Pearls and her family the day of the shooting; Braden obtained, modified, and expressed a desire to use a shotgun the day of the shooting; Braden, holding his shotgun, was in a car with Lopez and Stone the night of the shooting; Braden failed to deny participating in the shooting when confronted by Athas the next day (see Part VII, post)[9]; and Braden admitted participating in the shooting to a jailhouse informant (see Part IV, post )[10]. The omission of proper accomplice instructions as to Braden was harmless error.

People v. Lopez, 2016 WL 634651, at *16-18 (footnotes omitted).

As an initial matter, to the extent petitioner claims that the trial court violated his rights under state law, the claim is not cognizable on federal habeas review. On habeas corpus review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States. Estelle v. McGuire, 502 U.S. 62, 67-68 (1991) (noting that "it is not the province of a federal habeas court to reexamine state-court determinations on state-law questions."); see also Menendez v. Terhune, 422 F.3d 1012, 1029 (9th Cir. 2005) ("Failure to give a jury instruction which might be proper as a matter of state law, by itself, does not merit federal habeas relief.") (internal quotation marks omitted). A failure to give an instruction "must so infect the entire trial" that the petitioner was deprived of the fair trial guaranteed by the Fourteenth Amendment. Dunckhurst v. Deeds, 859 F.2d 110, 114 (9th Cir. 1988) (internal quotation marks omitted). "Whether a constitutional violation has occurred will depend upon the evidence in the case and the overall instructions given to the jury." Duckett v. Godinez, 67 F.3d 734, 745 (9th Cir. 1995). The omission of an instruction is less likely to be prejudicial than a misstatement of the law. Walker v. Endell, 850 F.2d 470, 475-76 (9th Cir. 1987). A habeas petitioner whose

---

[9] Referring to Claim 5, below.

[10] Referring to Claim 7, below.

claim involves a failure to give a particular instruction, as opposed to a claim that involves a misstatement of the law in an instruction, bears an "'especially heavy burden.'" <u>Villafuerte v. Stewart</u>, 111 F.3d 616, 624 (9th Cir. 1997) (quoting <u>Henderson v. Kibbe</u>, 431 U.S. 145, 155 (1977)). Petitioner also must show actual prejudice from the error, i.e., that the error had a substantial and injurious effect or influence in determining the jury's verdict, before the court may grant federal habeas relief. <u>Calderon v. Coleman</u>, 525 U.S. 141, 146 (1998) (citing <u>Brecht</u>, 507 U.S. at 637).

There is no clearly established federal law requiring juries to be instructed on the corroboration of accomplice testimony. <u>United States v. Augenblick</u>, 393 U.S. 348, 352 (1969) ("When we look at the requirements of procedural due process, the use of accomplice testimony is not catalogued with constitutional restrictions."); <u>accord</u> <u>Laboa v. Calderon</u>, 224 F.3d 972, 979 (9th Cir. 2000) ("Section 1111 [of the California Penal Code ] . . . prevent[s] convictions based on only uncorroborated accomplice testimony. As a state statutory rule, and to the extent that the uncorroborated testimony is not 'incredible or insubstantial on its face,' the rule is not required by the Constitution or federal law.").

Based on a review of the record, and applying these legal principles to petitioner's current allegations, the state court's rejection of this claim was not contrary to, and did not involve an unreasonable application of, Supreme Court precedent, and was not based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. 28 U.S.C. § 2254(d). Petitioner fails to show that omission of the instruction so infected the entire trial so as to result in an unconstitutional conviction. Further, the California Court of Appeal reasonably found that the missing instruction would not have aided petitioner given that there was ample corroboration of Stone's testimony. <u>See</u> <u>Brecht</u>, 507 U.S. at 623.

Accordingly, petitioner is not entitled to habeas relief on this claim.

### 5. Jury Instruction on Adoptive Admissions

Petitioner claims that he was either denied due process by the trial court's failure to instruct the jury with CALCRIM No. 357 on "adoptive admissions" or that he was denied effective assistance of counsel because counsel failed to request such an instruction. ECF No. 1 at

18-19. The California Court of Appeal summarized and rejected this claim as follows:

As noted in the factual background, Leonardo Lopez's girlfriend, Ashli Athas, testified that on the day after the shooting she answered Leonardo Lopez's cell phone and spoke to Braden. She told Braden, "You know that was like my cousin that you killed" or "Did you know that that was my little cousin you shot." Braden responded, "Oh my God, I'm sorry. Oh my God." or "Oh my God. I'm so sorry. I'm so sorry." Athas hung up immediately thereafter.

Evidence Code section 1221 permits the introduction of a party's adoptive admissions: "Evidence of a statement offered against a party is not made inadmissible by the hearsay rule if the statement is one of which the party, with knowledge of the content thereof, has by words or other conduct manifested his adoption or his belief in its truth."

On appeal, Braden contends there was ambiguity as to whether his response could be taken as an admission of guilt, because on cross-examination Athas testified she did not "accuse" Braden. Braden argues it is unclear whether he was "apologizing for being involved in the shooting, or whether he merely was expressing sympathy for Athas's loss." He claims the jury should have been instructed with CALCRIM No. 357, which would have directed the jury to determine whether Braden's statement was indeed an adoptive admission. Among other things, the instruction would have directed the jury to find whether the statement accused Braden of or connected him with the crime; whether Braden understood the statement; whether Braden "would, under all the circumstances, naturally have denied the statement if he thought it was not true;" and whether Braden could have but failed to deny the statement. (*Ibid.*) The instruction informs the jury that, if it finds the listed requirements satisfied, it "may conclude that the defendant admitted the statement was true." (*Ibid.*) On the other hand, if the jury were to find a listed requirement unmet, the instruction directs the jury to "not consider either the statement or the defendant's response for any purpose." (*Ibid.*)

In the present case, Braden concedes he did not request that the trial court instruct the jury with CALCRIM No. 357. It is well-established a trial court is not required to give CALCRIM No. 357 or an equivalent instruction sua sponte. As explained in *People v. Carter* (2003) 30 Cal.4th 1166, 1198 (*Carter*), with regard to the equivalent CALJIC instruction, "[A]doptive admissions require certain foundational facts. Trial courts may certainly instruct on the matter if they think it best to do so. But, as the Evidence Code makes clear, courts are required to so instruct only at a defendant's request. When the court admits evidence subject to the existence of preliminary facts, it '[m]ay, and on request shall, instruct the jury to determine whether the preliminary fact exists and to disregard the proffered evidence unless the jury finds that the preliminary fact does exist.' [Citation.] 'On its own terms, this provision makes it discretionary for the trial court to give an instruction regarding a preliminary fact unless the party makes a request.'" (See also *People v. Charles* (2015) 61 Cal.4th 308, 331.)

Braden argues that, because the alleged adoptive admission was critical to the

prosecution's case, the trial court was obligated to instruct the jury regarding such admissions under *People v. Atwood* (1963) 223 Cal.App.2d 316, 334, which held the trial court erred in failing to provide such an instruction sua sponte. However, the Supreme Court explained in *People v. Najera* (2008) 43 Cal.4th 1132, 1139, fn. 3, that *Atwood* turned on "'the particular evidentiary circumstances of the case,' which included error in giving instructions . . . on oral admissions that 'would have a tendency to mislead the jury.'" *Najera* reaffirmed *Carter* and stated that Atwood imposes no "categorical duty on trial courts to instruct on these issues." (*Najera*, at p. 1139, fn. 3.) Because Braden points to no unusual circumstances analogous to those in *Atwood*, the general rule announced in *Carter* applies.

Braden argues in the alternative that, if the court was not obligated to instruct on adoptive admissions sua sponte, then his trial counsel's failure to request that the jury be instructed with CALCRIM No. 357 was ineffective assistance of counsel. To establish a violation of his state and federal constitutional right to counsel, Braden must demonstrate his counsel's performance was "deficient" and "the deficient performance prejudiced the defense." (*Strickland, supra*, 466 U.S. at p. 687; see also *Ledesma, supra*, 43 Cal.3d at pp. 215-217.) "If the record does not shed light on why counsel acted or failed to act in the challenged manner, we must reject the claim on appeal unless counsel was asked for and failed to provide a satisfactory explanation, or there simply can be no satisfactory explanation." (*People v. Scott* (1997) 15 Cal.4th 1188, 1212.)

Braden argues his counsel's performance was deficient because "there could be no reasonable tactical purpose for failing to request instruction on critical evidence that directly contradicted [Braden's] defense: his seeming adoption of an accusation that he killed Skyler [Rapp]." He also emphasizes his counsel "was well aware of the damning nature of Athas's testimony," because counsel argued to the jury that she was biased against Braden because of her relationship with Leonardo Lopez. Braden reasons in his argument on appeal, "[a]s counsel made these efforts to persuade the jury to ignore Athas's testimony, it makes no sense for counsel not to have asked for [the adoptive admission] instruction" because it would have precluded the jury's consideration of the testimony at issue if the jury found Braden's statements were merely an expression of sympathy.

Braden disregards the possibility that, if the jury found Braden's statements were indeed an adoptive admission, CALCRIM No. 357 would have instructed the jury that if it found, among other requirements, that Braden would "naturally have denied the statement if he thought it was not true," then the jury could "conclude that the defendant admitted the statement was true." Thus, the instruction was a double-edged sword: If the jury accepted Braden's interpretation of the testimony, the instruction would lead the jury to disregard it; but if the jury accepted the prosecution's interpretation, the instruction would lead the jury to view Braden's statement as an admission of guilt. In such circumstances, Braden's trial counsel may have made a "reasonable tactical decision[ ]" (*People v. Lucas* (1995) 12 Cal.4th 415, 437 (*Lucas*)) not to request the instruction.

The California Supreme Court recognized in *Carter, supra*, 30 Cal.4th at p. 1198, that trial counsel might reasonably opt not to seek an instruction such as

CALCRIM No. 357, explaining, "In a given case, it may be far from clear whether the defendant would wish the court to give [the CALJIC equivalent to CALCRIM No. 357]. The instruction is largely a matter of common sense—silence in the face of an accusation is meaningful, and hence may be considered, only when the defendant has heard and understood the accusation and had an opportunity to reply. Giving the instruction might cause the jury to place undue significance on bits of testimony that the defendant would prefer it not examine so closely." Braden's claim of ineffective assistance of counsel fails.

People v. Lopez, 2016 WL 634651, at *22-24.

### a.      Instructional Error

Applying the legal principles of instructional error, outlined above in conjunction with Claim 4, to petitioner's current allegations, the state court's rejection of this claim was not contrary to, and did not involve an unreasonable application of, Supreme Court precedent, and was not based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. 28 U.S.C. § 2254(d). Again, to the extent petitioner claims the trial court should have given the instruction as a matter of state law, such a claim is not cognizable on federal habeas review. Estelle 502 U.S. at 67-68; Menendez, 422 F.3d at 1029. Further, petitioner has not shown that failure to give the instruction "so infected the entire trial that the resulting conviction violates due process." Kibbe, 431 U.S. at 154.

### b.      Ineffective Assistance of Counsel

Claims of ineffective assistance of counsel are examined under Strickland v. Washington, 466 U.S. 668 (1984). "The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." Id. at 686. In order to prevail on a claim of ineffectiveness of counsel, a petitioner must establish two factors. First, he must establish that counsel's performance was deficient, i.e., that it fell below an "objective standard of reasonableness" under prevailing professional norms, id. at 687-88, "not whether it deviated from best practices or most common custom," Harrington v. Richter, 562 U.S. 86, 105 (2011) (citing Strickland, 466 U.S. at 690). "A court considering a claim of ineffective assistance must apply a 'strong presumption' that counsel's representation was within the 'wide range' of reasonable professional assistance." Id. at 104 (quoting Strickland, 466 U.S. at 689).

1    Second, he must establish that he was prejudiced by counsel's deficient performance, i.e.,

2    that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the

3    proceeding would have been different." Strickland, 466 U.S. at 694. A reasonable probability is a

4    probability sufficient to undermine confidence in the outcome. Id. "The likelihood of a different

5    result must be substantial, not just conceivable." Richter, 562 U.S. at 112 (citing Strickland, 466

6    U.S. at 693). It is unnecessary for a federal court considering an ineffective assistance of counsel

7    claim on habeas review to address the prejudice prong, i.e., the second factor of the Strickland test,

8    if the petitioner cannot establish incompetence, as required under the first prong. Siripongs v.

9    Calderon, 133 F.3d 732, 737 (9th Cir. 1998).

10    The standards of both 28 U.S.C. § 2254(d) and Strickland are "highly deferential, and

11    when the two apply in tandem, review is doubly so." Richter, 562 U.S. at 105 (internal citations

12    and quotation marks omitted). "[T]he question [under § 2254(d)] is not whether counsel's actions

13    were reasonable. The question is whether there is any reasonable argument that counsel satisfied

14    Strickland's deferential standard." Id.

15    Based on a review of the record, and applying these legal principles to petitioner's current

16    allegations, the state court's rejection of this claim was not contrary to, and did not involve an

17    unreasonable application of, Supreme Court precedent, and was not based on an unreasonable

18    determination of the facts in light of the evidence presented in the state court proceeding. 28

19    U.S.C. § 2254(d). The California Court of Appeal reasonably found that counsel could have made

20    a reasonable tactical choice to simply attack Athas's credibility, rather than highlight petitioner's

21    statement to the jury by requesting CALCRIM No. 357. See Stanley v. Schriro, 598 F.3d 612, 636

22    (9th Cir. 2010) ("Capable lawyers evaluate not only what they ought to do, but what they ought

23    not to do. Where action on behalf of a client has a considerable likelihood of backfiring, they

24    avoid it."). Finally, petitioner fails to show the necessary prejudice. Specifically, it cannot be said

25    that there was a reasonable probability of a different verdict had counsel requested the instruction,

26    given the ambiguous nature of the statement itself and the otherwise strong evidence of

27    petitioner's guilt.

28    Accordingly, petitioner is not entitled to habeas relief on this claim.

United States District Court
Northern District of California

### 6. Jury Instruction on Uncharged Acts

Petitioner claims he was either denied due process by the trial court's failure to instruct "on how to evaluate evidence of uncharged 'bad acts'" or that he was denied his right to the effective assistance of counsel due to counsel's failure to request such an instruction. ECF No. 1 at 20-21. The California Court of Appeal summarized and rejected this claim as follows:

> Under Evidence Code section 1101, subdivision (a), evidence of a person's character is generally inadmissible "to prove his or her conduct on a specified occasion." On the other hand, the statute does not prohibit "the admission of evidence that a person committed a crime, civil wrong, or other act when relevant to prove some fact (such as motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident, . . . ) other than his or her disposition to commit such an act." Braden contends that the trial court erred in failing to sua sponte instruct the jury on the limited purposes for which evidence of his uncharged acts was admitted at trial, or alternatively that his counsel was ineffective in failing to request such an instruction. We reject his claims.
>
> *A. Background*
>
> At trial, Daniel Loyd, the jailhouse informant, testified to various uncharged bad acts by Braden. Loyd testified that Braden twice asked if Loyd would buy, or knew someone who would buy, 15 pounds of marijuana. Braden also offered to sell Loyd guns, claiming he could get Loyd any gun he wanted and that he currently had 4 shotguns, an AK–47 assault rifle, and a nine-millimeter pistol. Braden said he sold firearms to gang members and had firearms "all the time." Braden related selling a pistol to a friend in Rohnert Park who committed a murder with the weapon. Braden claimed he sent people to scare Athas and "talked about having some of the witnesses in his case killed." Finally, Braden discussed a plan to escape from jail, which involved overpowering a guard and escaping in a waiting car with guns.
>
> Also at trial, Stone testified that, while driving from his girlfriend Painchaud's apartment to Eeds's house before the shooting, Braden said to drive carefully because, "I'm wanted for murder right now."
>
> *B. Analysis*
>
> On appeal, Braden does not contend the trial court erred in admitting the testimony referenced above, or that trial counsel was ineffective in failing to object to the testimony. Instead, Braden contends the jury should have been instructed pursuant to CALCRIM No. 375 regarding "the use it could make of the 'uncharged offenses' testimony" in the case. That instruction, which requires substantial customization by the trial court, would have referenced the evidence of other offenses or acts; informed the jury it could consider the evidence only if the People proved commission of the other offenses or acts by a preponderance of the evidence;

26

instructed the jury it could consider any proven offenses or acts for specific purposes, such as identity, intent, motive, or knowledge; and cautioned the jury not to consider the evidence for any other purpose or to conclude the defendant is disposed to commit crime. (CALCRIM No. 375.)

Generally, the trial court has no sua sponte duty to give a limiting instruction on past conduct, such as CALCRIM No. 375. (*People v. Collie* (1981) 30 Cal.3d 43, 63–64; see also *Carter, supra,* 30 Cal.4th at p. 1198.) As *Collie* explained, "Neither precedent nor policy favors a rule that would saddle the trial court with the duty either to interrupt the testimony sua sponte to admonish the jury whenever a witness implicates the defendant in another offense, or to review the entire record at trial's end in search of such testimony." (*Collie,* at p. 64.) Nevertheless, "[t]here may be an occasional extraordinary case in which unprotested evidence of past offenses is a dominant part of the evidence against the accused, and is both highly prejudicial and minimally relevant to any legitimate purpose. In such a setting, the evidence might be so obviously important to the case that sua sponte instruction would be needed to protect the defendant from his counsel's inadvertence." (*Ibid.*)

Braden argues the present case is one of those extraordinary cases where the trial court was obligated to provide a limiting instruction sua sponte because Stone and Loyd were the prosecution's "key witnesses." However, assuming they were, that does not mean that the evidence of past offenses was itself "a dominant part of the evidence against" Braden. (*Collie, supra,* 30 Cal.3d at p. 64.) Stone was an important witness because he testified he witnessed Braden firing into Sparks's backyard, not because he testified to Braden's stray and ambiguous remark about being wanted for murder. Similarly, Loyd was an important witness because he testified Braden admitted committing the charged offenses, including killing Skyler Rapp, not because he testified to Braden's other comments about guns, drugs, and a prison escape. Furthermore, none of the testimony about Braden's other offenses and acts was "highly prejudicial" (*ibid.*) relative to the grievous conduct at issue in the charged offenses. Finally, Braden effectively concedes the evidence was more than "minimally relevant" (*ibid.*), acknowledging his admissions about past conduct "involved uncharged bad acts about possessing and furnishing guns, assisting in a murder, and committing violence, [and] arguably bore on [Braden's] intent, motive, modus operandi and other factors." This was not an "extraordinary case" (*ibid.*) in which the trial court is required to sua sponte instruct the jury on the limited uses of evidence of other acts and offenses.

Braden argues in the alternative that, if the court was not obligated to give a limiting instruction sua sponte, then trial counsel's failure to request that the jury be instructed with CALCRIM No. 375 was ineffective assistance. As explained previously, to establish a violation of his state and federal constitutional right to counsel, Braden must demonstrate his counsel's performance was "deficient" and "the deficient performance prejudiced the defense." (*Strickland, supra,* 466 U.S. at p. 687; see also *Ledesma, supra,* 43 Cal.3d at pp. 215–217.) Braden has not demonstrated deficient performance, because trial counsel could have made a "reasonable tactical decision[ ]" (*Lucas, supra,* 12 Cal.4th at p. 437) not to request the instruction. For example, the instruction would have reminded the jurors of all of the uncharged acts mentioned during the trial and suggested how the acts might

be relevant to the issues before the jury. (See *People v. Hernandez* (2004) 33 Cal.4th 1040, 1053 ["an instruction on use of this testimony properly might explain how it could be used as well as how it could not be used"].) Trial counsel might reasonably have decided it would be better not to provide the jury such a summary and guidance. Braden's claim of ineffective assistance of counsel fails.

People v. Lopez, 2016 WL 634651, at *24-25 (footnote omitted).

Applying the legal principles of instructional error and ineffective assistance of counsel, outlined above in conjunction with Claims 4 and 5, to petitioner's current allegations, the state court's rejection of this claim was not contrary to, and did not involve an unreasonable application of, Supreme Court precedent, and was not based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. 28 U.S.C. § 2254(d). Again, to the extent petitioner claims the trial court should have given the instruction as a matter of state law, such a claim is not cognizable on federal habeas review. See Estelle 502 U.S. at 67-68; Menendez, 422 F.3d at 1029. Further, the California Court of Appeal reasonably found that the portions of Stone's and Loyd's testimony that petitioner complains of were admissible for legitimate purposes under California Evidence Code section 1101 and were markedly less significant than the portions of their testimony directly linking petitioner to the charged offenses. As such, the omission of the CALCRIM No. 375 instruction did not rise to the level of federal constitutional error. See Kibbe, 431 U.S. at 154. Finally, the California Court of Appeal reasonably found that counsel could have made a tactical decision not to highlight the uncharged acts by requesting the instruction. Nor can it be said that there was a reasonable probability of a different verdict had counsel requested the instruction, given the otherwise strong evidence of petitioner's guilt. Strickland, 466 U.S. at 687-88, 694.

Accordingly, petitioner is not entitled to habeas relief on this claim.[11]

---

[11] At the conclusion of his arguments in Claim 5 and Claim 6, petitioner asserts that counsel was ineffective for failing to present mitigating evidence. Specifically, in connection with Claim 5, petitioner asserts, "Furthermore, I make claim that trial counsel was [illegible] ineffective as counsel as he failed to present mitigating evidence on my behalf ultimately changing the course of the trial by definition [sic] a jury instruction would be considered mitigating evidence." ECF No, 1 at 19. In connection with Claim 6, petitioner asserts that counsel was ineffective for "failure to present mitigating evidence." ECF No. 1 at 21. Petitioner did not present these claims to the California Supreme Court, so they are unexhausted. See Rose v. Lundy, 455 U.S. 509, 522 (1982) (holding a petitioner must present to the highest state court all claims he wishes to raise in a federal habeas petition). While a court may not grant relief on an unexhausted claim, see 28

**7.    Jury Instruction on In-Custody Informant Testimony**

Petitioner claims he was denied due process by the trial court's failure to sua sponte instruct the jury with CALCRIM No. 336 on the corroboration requirement for in-custody informant testimony.  ECF No. 1 at 22.  The California Court of Appeal summarized and rejected this claim as follows:

> At the time of trial, Daniel Loyd, who testified regarding various statements made to him by Braden in jail, was in custody on a pending murder charge.  The trial court instructed Braden's jury that Loyd was an in-custody informant and, in the language of CALCRIM No. 336, "The testimony of an in-custody informant should be viewed with caution and close scrutiny.  In evaluating such testimony, you should consider the extent to which it may have been influenced by the receipt of, or expectation of, any benefits from the party calling that witness.  This does not mean that you may arbitrarily disregard such testimony, but you should give it the weight to which you find it to be entitled in the light of all the evidence in the case."
>
> The trial court's instruction did not inform the jury that the testimony of an in-custody informant must be corroborated.  That requirement is contained in section 1111.5, subdivision (a), which went into effect on January 1, 2012—before the January 19 commencement of trial in the present case.  (See *People v. Davis* (2013) 217 Cal.App.4th 1484, 1488-1489 (*Davis*); see also *People v. Huggins* (2015) 235 Cal.App.4th 715, 718-719.)  That section reads in pertinent part: "A jury or judge may not convict a defendant, find a special circumstance true, or use a fact in aggravation based on the uncorroborated testimony of an in-custody informant.  The testimony of an in-custody informant shall be corroborated by other evidence that connects the defendant with the commission of the offense, the special circumstance, or the evidence offered in aggravation to which the in-custody informant testifies.  Corroboration is not sufficient if it merely shows the commission of the offense or the special circumstance or the circumstance in aggravation." (§ 1111.5. subd. (a).)  The trial court erred in failing to sua sponte instruct the jury on the in-custody informant requirement.  (*Davis*, at p. 1489.)
>
> In *Davis, supra*, 217 Cal.App.4th at p. 1489, the Court of Appeal concluded the trial court's error should be assessed for prejudice under the test for state law error (*Watson, supra*, 46 Cal.2d at p. 836), rather than the under the sufficiency of the corroborating evidence test that applies to failure to instruct on accomplice

---

U.S.C. § 2254(b)(1)(A), it may deny an unexhausted claim on the merits, see id. § 2254 (b)(2); Runningeagle v. Ryan, 686 F.3d 758, 777 n.10 (9th Cir. 2012) (exercising discretion under § 2254(b)(2) to deny unexhausted claim on the merits).  The Court will deny the claims here as lacking merit.  A jury instruction is not evidence, mitigating or otherwise.  In any event, petitioner fails to identify what allegedly mitigating evidence counsel should have introduced.  See United States v. Schaflander, 743 F.2d 714, 721 (9th Cir. 1984) (holding petitioner must make sufficient factual showing to substantiate ineffective assistance of counsel claim).

corroboration. (See Part III.B., *ante*.)[12]  Following *Davis*, we "reverse the judgment only if we are able to say it is reasonably probable the jury would have reached a result more favorable to defendant if the trial court had instructed that before the jury could convict defendant based solely on the testimony of [Loyd], an in-custody informant, there must be evidence that corroborates that testimony, i.e., that connects [Braden] to the commission of the crime." (*Id.* at p. 1490.)

As explained with reference to the trial court's failure to instruct the jury regarding the requirement of corroboration in the accomplice context (see Part III.B., *ante*)[13], there is a plethora of evidence connecting Braden to the commission of the crime. (See *Davis, supra*, 217 Cal.App.4th at p. 1491 [physical evidence and evidence suggesting a motive sufficient to connect the defendant to murder].)  It is not reasonably probable the jury would have reached a result more favorable to Braden had the trial court instructed his jury regarding the in-custody informant corroboration requirement.

People v. Lopez, 2016 WL 634651, at *18-19.

The Supreme Court has never held that the uncorroborated testimony of an in-custody informant is insufficient to support a criminal conviction.  See Carey v. Musladin, 549 U.S. 70, 77 (2006) (where Supreme Court precedent gives no clear answer to question presented, "it cannot be said that the state court 'unreasonab[ly] appli[ed] clearly established Federal law'") (alterations in original).  Further, as previously noted, both the Supreme Court and the Ninth Circuit have rejected the notion that corroboration for accomplice testimony is constitutionally mandated.  See Augenblick, 393 U.S. at 352; Laboa, 224 F.3d at 979.  Given this precedent, there is little reason to believe that the Supreme Court, if faced with the issue, would conclude that corroboration for in-custody informant testimony is constitutionally mandated.

Applying these legal principles, along with the legal principles on instructional error outlined above in conjunction with Claim 4, to petitioner's current allegations, the state court's rejection of this claim was not contrary to, and did not involve an unreasonable application of, Supreme Court precedent, and was not based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.  28 U.S.C. § 2254(d).  Petitioner's argument that the instruction was required under state law at the time of trial is not a basis for federal habeas relief.  See Estelle 502 U.S. at 67-68; Menendez, 422 F.3d at 1029.  Further, the

United States District Court
Northern District of California

---

[12] Referring to Claim 4, above.

[13] Referring to Claim 4, above.

California Court of Appeal reasonably found that there was ample evidence to corroborate Loyd's testimony. As such, petitioner does not meet his "especially heavy burden" of showing the omitted instruction so infected the entire trial as to constitute a denial of due process. See <u>Kibbe</u>, 431 U.S. at 154. For the same reason, even assuming error, there was no substantial and injurious effect or influence in determining the jury's verdict. See <u>Brecht</u>, 507 U.S. at 623.

Accordingly, petitioner is not entitled to habeas relief on this claim.

### 8. Jury Instruction on "Kill Zone"

Petitioner claims he was denied due process when the trial court "misinstructed [the] jury on the specific intent required for [the] 'kill zone' theory of attempted murder." ECF No. 1 at 23-24. The California Court of Appeal summarized and rejected this claim as follows:

> Appellants Lopez and Braden contend the trial court's instruction on the "kill zone" theory of attempted murder, in combination with the prosecutor's closing arguments, led their juries to understand they could convict the appellants of attempted murder without finding the appellants formed the specific intent to kill the named victims. Although a portion of the instruction was unclear, we disagree there is a reasonable likelihood the jury applied the instruction in the way appellants suggest.

> *A. The "Kill Zone" Theory of Attempted Murder*

> "Attempted murder requires proof of a direct but ineffectual act done towards killing another human being and the specific intent to unlawfully kill another human being. [Citation.] Unlike the mental state for murder, which does not require an intent to kill but only a conscious disregard for life (implied malice), '[a]ttempted murder requires the specific intent to kill . . . .' [Citation.] The doctrine of 'transferred intent,' transferring the intent to kill an intended target to an unintended victim, applies to murder but not to attempted murder." (*People v. Campos* (2007) 156 Cal.App.4th 1228, 1242 (*Campos*).) As the California Supreme Court explained in *Bland, supra*, 28 Cal.4th at p. 328, "[t]o be guilty of attempted murder, the defendant must intend to kill the alleged victim, not someone else. The defendant's mental state must be examined as to each alleged attempted murder victim. Someone who intends to kill only one person and attempts unsuccessfully to do so, is guilty of the attempted murder of the intended victim, but not of others." (*Id.* at p. 328.)

> Nevertheless, "the fact [a] person desires to kill a particular target does not preclude finding that the person also, concurrently, intended to kill others within [a] 'kill zone.' 'The intent is concurrent . . . when the nature and scope of the attack, while directed at a primary victim, are such that we can conclude the perpetrator intended to ensure harm to the primary victim by harming everyone in that victim's vicinity . . . . Where the means employed to commit the crime against a primary

victim create a zone of harm around that victim, the factfinder can reasonably infer that the defendant intended that harm to all who are in the anticipated zone.'" (*Bland, supra*, 28 Cal.4th at pp. 329-330.) In *Bland*, the evidence showed the defendant intended to create a kill zone where he "fired a flurry of bullets" at a car driven by the primary target that also contained passengers. (*Id.* at pp. 330-331.) The court explained, "Even if the jury found that defendant primarily wanted to kill [the driver] rather than [his] passengers, it could reasonably also have found a concurrent intent to kill those passengers" by creating a "kill zone." (*Ibid.*) *Bland* noted that the kill zone analysis "is not a legal doctrine requiring special jury instructions, as is the doctrine of transferred intent. Rather, it is simply a reasonable inference the jury may draw in a given case: a primary intent to kill a specific target does not rule out a concurrent intent to kill others." (*Id.* at p. 331, fn. 6.) The "defendant's mental state must be examined as to each alleged attempted murder victim." (*Id.* at pp. 327-328.)

In *People v. Perez* (2010) 50 Cal.4th 222, the California Supreme Court declined to apply the kill zone theory in circumstances where a single shot was fired into a crowd. Instead, the Court held the evidence supported only a single conviction of attempted murder where the defendant fired one shot at a group of eight people. (*Id.* at pp. 224-225.) The Court reasoned that the "defendant fired the single shot at the group intending to kill someone, but without targeting any particular individual, and without using a means of force calculated to kill everyone in the group." (*Id.* at p. 225.) Absent evidence the defendant intended to kill multiple specific individuals or intended to kill everyone in the group but was thwarted from continuing to fire, eight convictions could not be sustained. (*Id.* at p. 231.)

In *People v. McCloud* (2012) 211 Cal.App.4th 788, two defendants fired 10 shots from a handgun at a party at which 400 people were present, resulting in two deaths and one injury. (*Id.* at pp. 790-791.) The defendants were convicted of two counts of second degree murder, and one defendant was convicted of 46 counts of attempted murder. (*Id.* at p. 791.) The Court of Appeal held the trial court erred by instructing the jury on the kill zone theory of attempted murder, because there was no evidence the defendants intended to kill with ten bullets the 46 people who were in the area of the primary target. (*Id.* at pp. 791, 799-800.) The court interpreted *Bland* to mean that "In a kill zone case, the defendant does not merely subject everyone in the kill zone to lethal risk. Rather, the defendant specifically intends that everyone in the kill zone die. If some of those individuals manage to survive the attack, then the defendant—having specifically intended to kill every single one of them and having committed a direct but ineffectual act toward accomplishing that result—can be convicted of their attempted murder." (*Id.* at p. 798.) Attempted murder convictions on a kill zone theory cannot be based on conduct that only "subject[s] everyone in the kill zone to lethal risk." (*Id.* at p. 798.) In *McCloud*, the evidence was sufficient only to sustain eight attempted murder convictions, based on the eight bullets fired that did not result in deaths. (*Id.* at pp. 791, 807.)

In *People v. Canizales*, review granted November 19, 2014, S221958, the California Supreme Court is further considering how to apply the kill zone theory. The issue in that case is simply, "Was the jury properly instructed on the 'kill zone'

theory of attempted murder?"

### B. The Trial Court's Instruction Failed to Clearly Explain the Kill Zone Theory But Did Not Negate the Intent Element

The trial court instructed both juries on attempted murder with CALCRIM No. 600 without objection from Braden or Lopez. At the outset, the instruction referenced the five counts of attempted murder and informed each jury the People were required to prove the defendant "took at least one direct but ineffective step toward killing another person" and "intended to kill that person."

Regarding the kill zone theory, the instruction told the juries, "A person may intend to kill a specific victim or victims and at the same time intend to kill everyone in a particular zone of harm or 'kill zone.' In order to convict the defendant of the attempted murder of Desiree Kirby, Andrew Sparks, Joseph Armijo, Ian Griffith or Ross Sparks the People must prove that the defendant not only intended to kill either Desiree Kirby, Andrew Sparks, Joseph Armijo, Ian Griffith or Ross Sparks but also intended to kill Desiree Kirby, Andrew Sparks, Joseph Armijo, Ian Griffith or Ross Sparks or intended to kill everyone within the kill zone. If you have a reasonable doubt whether the defendant intended to kill Desiree Kirby, Andrew Sparks, Joseph Armijo, Ian Griffith or Ross Sparks or intended to kill Desiree Kirby, Andrew Sparks, Joseph Armijo, Ian Griffith or Ross Sparks by killing everyone in the kill zone, then you must find the defendant not guilty of the attempted murder of Desiree Kirby, Andrew Sparks, Joseph Armijo, Ian Griffith or Ross Sparks."

Appellant Braden contends CALCRIM No. 600 as given in the present case "did not require [the jury] to separately examine [Braden's] mental state with respect to each named victim of alleged attempted murder and instead suggested intent to kill could be 'transferred.'" He argues the trial court's instruction led the jury to believe it could convict him of the "five charged attempted murders if it found he either intended to kill Kirby or Sparks or Armijo or Griffith or Andrew Sparks, or intended to kill everyone in the kill zone." Lopez also contends the jury was led to understand they could convict on the attempted murder charges without particularized findings of intent to kill each of the victims.

We agree the portion of the instruction Braden focuses on failed to clearly explain the kill zone theory of attempted murder. The second sentence in the kill zone paragraph of CALCRIM No. 600 is designed to explain that, in order to convict the defendant of the attempted murder of the alleged victim on a theory of concurrent intent, the People must prove that the defendant intended to kill a primary target and also intended either to kill the alleged victim or to kill everyone in the kill zone. The pattern instruction is written to allow for two possibilities—that the alleged victim was specifically targeted by the defendant, or was targeted merely because the victim was in the kill zone. Unfortunately, when the trial court inserted the names of the five alleged victims, the sentence became nonsensical because it failed to distinguish between the primary target and the named alleged victim. In particular, the modified sentence failed to make clear that in the first and third listings of names the named individuals were being referenced in their capacity as

the named victims in the five attempted murder counts, and that in the second listing of names the individuals were being referenced as possible primary targets. That is, the sentence was intended to inform the jury that in order to convict a defendant of attempted murder of any of the alleged victims on a theory of concurrent intent, the People were required to prove the defendant intended to kill one of them as a primary target and, also, either specifically intended to kill the alleged named victim or intended to kill everyone in the kill zone.

Although we think the sentence at issue was more nonsensical than misleading, it arguably is amenable to the construction Braden suggests. In particular, the sentence can be read to inform the jury that, in order to convict a defendant of the attempted murder of one of the named victims, the People must prove that the defendant intended to kill any one of the named victims and also either any other one of the named victims or everyone in the kill zone. The instruction can be read to suggest a conviction may be based on a defendant's intent to kill two other named victims, who need not be the victim named in the count. Although the language at issue does not unambiguously misinform the jurors that a conviction may be based merely on the presence of the victim in the kill zone and a defendant's intent to kill anyone in the kill zone, neither does it clearly communicate that, where the named victim is not specifically targeted, the People must show the defendant intended to kill everyone in the kill zone.

The other portions of the kill zone instruction did not entirely clarify the issue, but they did tend to undermine Braden's interpretation. Most importantly, the first sentence of the paragraph on the kill zone theory properly and plainly told the jury "[a] person may intend to kill a specific victim or victims and at the same time intend to kill everyone in a particular zone of harm or 'kill zone.'" The final sentence of the kill zone paragraph informed the jury, "If you have a reasonable doubt whether the defendant intended to kill [one of the named victims,] or intended to kill [one of the named victims] by killing everyone in the kill zone, then you must find the defendant not guilty of the attempted murder of [one of the named victims]." The sentence is flawed in that it fails to make it clear the second reference to the named victims is in their capacity as possible primary targets, but the sentence does focus on particularized findings of intent to kill and contains a reference to a finding of intent to kill everyone in the kill zone.

On balance, although CALCRIM No. 600 as given in the present case is more nonsensical than misleading, it is sufficiently confusing and complicated that it may properly be characterized as ambiguous.

### C. The Prosecutor's Ambiguous Closing Arguments Did Not Create a Reasonable Likelihood the Juries Were Misled

"'If a jury instruction is ambiguous, we inquire whether there is a reasonable likelihood that the jury misunderstood and misapplied the instruction.' [Citations.] "'"[T]he correctness of jury instructions is to be determined from the entire charge of the court, not from a consideration of parts of an instruction or from a particular instruction."'" [Citations.] The reviewing court also must consider the arguments of counsel in assessing the probable impact of the instruction on the jury." (*People*

*v. Young* (2005) 34 Cal.4th 1149, 1202.) As noted above, although CALCRIM No. 600 as given to both juries in the present case properly identifies the intent element and contains at least one accurate description of the kill zone theory of attempted murder, the portion of the instruction describing the People's burden of proof under that theory was ambiguous. An examination of the prosecutor's closing arguments reveals a similar combination of clear statements on the intent requirement mixed with some more ambiguous language.

It is important to note the trial court was not required to give the kill zone instruction—the instruction merely sets forth "a reasonable inference the jury may draw in a given case: a primary intent to kill a specific target does not rule out a concurrent intent to kill others." (*Bland, supra*, 28 Cal.4th at p. 331, fn. 6; see also *McCloud, supra*, 211 Cal.App.4th at p. 802 ["It should be noted that the Supreme Court has repeatedly explained that jury instructions on the kill zone theory are never required."].) Thus, the trial court's failure to clearly explain the kill zone theory did not constitute a failure to "instruct on general principles of law that are commonly or closely and openly connected to the facts before the court and that are necessary for the jury's understanding of the case." (*People v. Montoya* (1994) 7 Cal.4th 1027, 1047.) Rather, the trial court's unclear kill zone instruction is only reversible error if there is a reasonable likelihood it led the juries to believe they could convict Lopez and Braden of attempted murder on the basis of transferred intent.

The prosecutor argued to Braden's jury, "In order to convict a defendant of attempted murder of a specific victim, the People must prove[ ] that the defendant intended to kill either a specific victim or intended to kill everyone in the kill zone. [¶] So what that means as it relates to this case is if someone shoots into a crowd intending to kill one, two, three, all of them, he is—he is guilty of attempting to murder regardless of who is killed or who doesn't get killed. So all you need is intent to kill one or more in a crowd, you shoot into a crowd, then you're guilty of attempted murder." The prosecutor further argued, "Doesn't matter who they wanted to kill, doesn't matter if they wanted to kill Ross Sparks or Desiree or any of the other ones or if they wanted to kill Skyler Rapp. I'm not saying that was the intent, don't get me wrong. We don't know who they wanted to kill, but they wanted to kill. [¶] When you shoot into a crowd of people, you shoot into the kill zone and if you kill someone that's murder. If you attempt to kill someone and they don't, then that's an attempted murder."

. . . .

Thus, in its first comments on the topic to both juries, the prosecutor properly characterized its burden—that the People must prove intent to kill a specific victim or to kill everyone in the kill zone. His subsequent comments were more ambiguous. The prosecutor acknowledged uncertainty about the identity of the primary target, and one interpretation of the prosecutor's comments is that if a defendant intended to kill at least one person in the crowd, then the defendant is guilty of the attempted murder of whoever was hit. However, another interpretation of the prosecutor's subsequent comments is that if a defendant shot into the crowd intending to kill anyone he could hit, he is guilty of attempted

murder of those that were hit. (See *People v. Stone* (2009) 46 Cal.4th 131, 138 ["In context, a jury hearing about the intent to kill anyone within the kill zone would probably interpret it as meaning the intent to kill any person who happens to be in the kill zone, i.e., everyone in the kill zone."] (*Stone*); *Bland, supra*, 28 Cal.4th at pp. 322-323 ["When one intends to kill and does so, the killing is hardly an accident, even if the specific victim or victims are unintended."]; *Campos, supra*, 156 Cal.App.4th at p. 1243 ["A defendant who shoots into a crowd of people with the desire to kill anyone he happens to hit, but not everyone, surely has the specific intent to kill whomever he hits, as each person in the group is at risk of death due to the shooter's indifference as to who is his victim."].)

In summary, both the instructions and the prosecutor's closing arguments contained clear statements describing the kill zone theory as requiring proof of specific intent to kill the named victim or proof of intent to kill everyone in the zone of harm. The instructions and arguments also contained ambiguous passages that arguably could be read to allow for transference of intent. Because the accurate statements of law were clear and the inaccurate statements only present by inference from ambiguous passages, we conclude there is no reasonable likelihood the jury misapplied the instruction and convicted absent proof of intent to kill the named victims.

People v. Lopez, 2016 WL 634651, at *11-15 (footnotes omitted).

In reviewing an ambiguous instruction, the inquiry is not how reasonable jurors could or would have understood the instruction as a whole; rather, the court must inquire whether there is a "reasonable likelihood" that the jury has applied the challenged instruction in a way that violates the Constitution. See Estelle v. McGuire, 502 U.S. at 72 & n.4; Boyde v. California, 494 U.S. 370, 380 (1990). In order to show a due process violation, the defendant must show both ambiguity and a "reasonable likelihood" that the jury applied the instruction in a way that violates the Constitution, such as relieving the state of its burden of proving every element beyond a reasonable doubt. Waddington v. Sarausad, 555 U.S. 179, 190-191 (2009) (internal quotations and citations omitted). A "meager 'possibility'" that the jury misapplied the instruction is not enough. Kansas v. Carr, 136 S. Ct. 633, 643 (2016) (quoting Boyde, 494 U.S. at 380).

A determination that there is a reasonable likelihood that the jury has applied the challenged instruction in a way that violates the Constitution establishes only that an error has occurred.[2] See Calderon v. Coleman, 525 U.S. 141, 146 (1998). If an error is found, the court

---

[2] A "reasonable likelihood" is lower than the "more likely than not" standard but higher than a mere "possibility." Polk v. Sandoval, 503 F.3d 903, 910 (9th Cir. 2007), overruled on other grounds by Babb v. Lozowsky, 719 F.3d 1019, 1029 (9th Cir. 2013).

also must determine that the error had a substantial and injurious effect or influence in determining the jury's verdict, see Brecht v. Abrahamson, 507 U.S. 619, 637 (1993), before granting relief in habeas proceedings. See Calderon, 525 U.S. at 146-47. Under this standard, a court must grant relief if there is "grave doubt" as to whether a jury would have found the relevant factors beyond a reasonable doubt. See O'Neal v. McAninch, 513 U.S. 432, 436 (1995). Grave doubt exists when "the matter is so evenly balanced" that the district court is in "virtual equipoise as to the harmlessness of the error." Id. at 434.

The Court agrees with the California Court of Appeal that the kill zone instruction was ambiguous in that it contained some accurate statements and other nonsensical statements. Unlike the California Court of Appeal, however, the Court finds there was a reasonable probability that the jury misapplied the instruction. Viewing the instruction given in combination with the prosecution's argument, there is a reasonable probability that the jury believed it was not required to examine petitioner's mental state with respect to each named victim of attempted murder and that it could find a transferred intent to kill.

Nonetheless, even had the correct instruction on kill zone been given—or had no kill zone instruction been given[14]—the Court cannot say there is grave doubt as to whether the jury would have returned the same verdict on the five counts of attempted murder. The jury was properly instructed on attempted murder under CALCRIM No. 600 as follows:

The defendant is charged in Counts 3, 6, 9[,] 11[,] and 13 with Attempted Murder.

To prove that the defendant is guilty of attempted murder, the People must prove that:

1. The defendant took at least one direct but ineffective step toward killing another person; AND

2. The defendant intended to kill that person.

---

[14] As noted by the California Court of Appeal, the kill zone theory is not an independent legal doctrine requiring separate instruction, but simply a statement of how to find concurrent intent to kill. People v. Bland, 28 Cal. 4th 313, 331, n.6 (2002). See also People v. McCloud, 211 Cal. App. 4th 788, 802 (2012) ("It should be noted that the Supreme Court has repeatedly explained that jury instructions on the kill zone theory are never required.")

Ex. 1at 486-87 (ECF No. 18-2 at 204-05).

There was ample evidence for a reasonable jury to convict petitioner on all five attempted murder counts on this instruction alone. Earlier on the day of the shooting, petitioner spoke to Crystal Pearls on the phone and told her, "I'm going to come there, we're going to—I'll kill you, I'll kill your family." Ex. 3 at 891-93 (ECF No. 18-13 at 133-35); Ex. 3 at 904, 973 (ECF No. 18-13 at 146, ECF No. 18-14 at 34). While awaiting trial in jail, petitioner admitted to Daniel Loyd that he had "blasted Rapp's little boy and the other motherfuckers that had it coming . . . ." Ex. 3 at 2123 (ECF No. 18-18 at 154).[15] Petitioner described to Loyd how he, Lopez, and Stone had driven to a residence in a van and "started blasting over the fence." Ex. 3 at 2110, 2139-40 (ECF No. 18-18 at 141, 170-71). Petitioner had a shotgun at Athas's party, and was heard to say, "I'm bored. Let's go shoot somebody," and "I didn't bring this gun to Clearlake for nothing. Let's go use it." Ex. 3 at 255 (ECF No. 18-10 at 218); Ex. 3 at 603, 615-16, 704, 743, 756 (ECF No. 18-12 at 14, 26-27, 115, 154, 167); Ex. 3 at 846 (ECF No. 18-13 at 88). Petitioner brought a shotgun with him into Eeds's yard when Stone dropped him off. Ex. 3 at 2522-23, 2542, 2571-72 (ECF No. 18-20 at 30-31, 50, 79-80). Petitioner matched the description of one of the shooters seen be a member of Sparks's party. Ex. 3 at 1120 (ECF No. 18-14 at 181). Stone testified that he saw petitioner fire repeatedly into the party and that petitioner was aiming each shot and making small adjustment after each firing. Ex. 3 at 2541, 2544-45 (ECF No. 18-20 at 49, 52-53). Stone heard five or six shots in total and did not see Lopez firing. Id. Ex. 3 at 2542 (ECF No. 18-20 at 50). The evidence showed that between three[16] and fourteen[17] shotgun blasts were heard and that seven people were hit. Desiree Kirby had 10 shotgun pellets in her arm and around 20 in her leg. Ex. 3 at 1036-37, 1039 (ECF No. 18-14 at 97-98, 100). Andrew Gamble had 12 pellets in his leg and 5 in his arm. Ex. 3 at 1068, 1109 (ECF No. 18-14 at 129, 170). Armijo was hit by three pellets, and Griffith was hit by two separate shotgun blasts. Ex. 3 at 1147, 1207 (ECF No. 18-14 at 208, 268). Ross Sparks was shot below his right gluteal muscle, and the bullet exited on the other side

---

[15] Skyler Rapp was Desiree Kirby's son from a previous relationship. Ex. 3 at 977 (ECF No. 18-14 at 38).

[16] Ex. 3 at 1156 (ECF No. 18-14 at 217) (Joseph Armijo testimony)

[17] Ex. 3 at 1203 (ECF No. 18-14 at 264) (Ian Griffith testimony)

through his upper thigh. Ex. 3 at 1597-98 (ECF No. 18-16 at 167-68).[18]  One child, Skyler Rapp, was killed by 12 shotgun pellets. Ex. 3 at 1282 (ECF No. 18-15 at 53); Ex. 3 at 1600 (ECF No. 18-6 at 170); Ex. 3 at 2280, 2477-2480 (ECF No. 18-19 at 82, 279-82).  In addition, the netting of the playpen where the baby, Eden, was sleeping was torn by the shots. Ex. 3 at 1033-34 (ECF No. 18-14 at 94-95), Ex. 3 at 1596-97 (ECF No. 18-16 at 166-67).  On this record, there was sufficient evidence for a jury to find that there was no primary target and that petitioner intended to kill everyone, or as many people as possible, in the Sparks's yard.  See People v. Campos, 156 Cal. App. 4th 1228, 1243 (2007) ("A defendant who shoots into a crowd of people with the desire to kill anyone he happens to hit, but not everyone, surely has the specific intent to kill whomever he hits, as each person in the group is at risk of death due to the shooter's indifference as to who is his victim.");  People v. Smith, 37 Cal.4th 733, 741 (2005) ("The act of firing toward a victim at a close, but not point blank, range 'in a manner that could have inflicted a mortal wound had the bullet been on target is sufficient to support an inference of intent to kill....' ") Given that the kill zone instruction was superfluous, any error in the instruction cannot be said to have had a substantial and injurious effect on the verdict.  See Brecht, 507 U.S. at 623.

There was also ample evidence to support a conviction on a kill zone instruction that properly instructed the jury to find that petitioner intended to kill a primary target and also either specifically intended to kill the alleged named victims or intended to kill everyone in the kill zone. Both Lopez and petitioner threatened to attack Ross Sparks after the June 17, 2011 meeting where Sparks and Lopez talked about the graduation fight, and Sparks told Lopez, "your brother's got one coming."  Specifically, the very next day Lopez and petitioner took turns arguing with Sparks over the phone. Ex. 3 at 452, 569-70 (ECF No. 18-11 at 169, 286-87); Ex. 3 at 595-98, 737-38 (ECF No. 18-12 at 6-9, 148-49); Ex. 3 at 1866-67 (ECF No. 18-17 at 138-39).  Braden was heard to say, "Let's meet up and handle this." Ex. 3 at 244, 246 (ECF No. 18-10 at 207, 209); Ex. 3 at 596 (ECF No. 18-12 at 7).  Lopez told Sparks he would "bash" Sparks and his family with same lead pipe Leonardo Lopez had used to hit Josh Gamble. Ex. 3 at 1568 (ECF No. 18-16 at 138).

---

[18] Amanda Gamble was hit once on her finger. Ex. 3 at 1322 (ECF No. 18-15 at 202).

Lopez and Sparks exchanged texts and calls with Lopez trying to get Sparks to meet for a fight and Sparks saying that he was at his home. Ex. 3 at 1569-73, 1638, 1643 (ECF No. 18-16 at 139-43, 208, 213). As discussed above, petitioner and Lopez drove to Sparks's home that evening and began firing indifferently on the Sparks party. This was sufficient for a jury to find that Sparks and/or his family members were primary targets and that petitioner intended to kill them by killing everyone in the kill zone.[19] Finally, as noted by the California Court of appeal, the kill zone instruction clearly directed the jurors to find petitioner not guilty if they could not conclude that "the defendant intended to kill" at least one of the named victims, or intended to kill everyone in the kill zone. Ex. 1 at 486-87. Given the evidence, and the accurate portions of the kill zone instruction, the Court does not have "grave doubt" that petitioner would have received the same verdict had the challenged portion of the kill zone instruction been given differently. See Brecht, 507 U.S. at 623; O'Neal, 513 U.S. at 436.

Accordingly, petitioner is not entitled to habeas relief on this claim.

### 9. Cumulative Error

Petitioner claims that "the cumulative effect" of the errors alleged in Claims 2 through 8 denied his "Fourteenth Amendment rights to due process and fundamental fairness." ECF No. 1 at 25. In some cases, although no single trial error is sufficiently prejudicial to warrant reversal, the cumulative effect of several errors may still prejudice a defendant so much that his conviction must be overturned. Alcala v. Woodford, 334 F.3d 862, 893-95 (9th Cir. 2003). Where there is no single constitutional error existing, nothing can accumulate to the level of a constitutional violation. Hayes v. Ayers, 632 F.3d 500, 524 (9th Cir. 2011). Here the Court has not found any error, with the one exception of harmless error in the "kill zone" instruction. Based on this record, the Court concludes that petitioner is not entitled to habeas relief on a claim that he suffered cumulative prejudice from several trial errors.

Accordingly, petitioner is not entitled to habeas relief on this claim.

---

[19] As noted above both Lopez and petitioner threatened not just Sparks but also Sparks' family. Ex. 3 at 891-93 (ECF No. 18-13 at 133-35); Ex. 3 at 904, 973 (ECF No. 18-13 at 146, ECF No. 18-14 at 34); Ex. 3 at 1568 (ECF No. 18-16 at 138).

### 10. Sufficiency of Evidence Supporting Firearm Enhancements

Petitioner claims he was denied due process because "there is insufficient evidence in the appellate[] record[] to support a jury finding that petitioner's personal discharge of a firearm proximately caused the death of Skylar [sic] R. or great bodily injury to Kirby, Andrew Sparks, Armijo, Griffith and Ross Sparks." ECF No. 1 at 26. The California Court of Appeal summarized and rejected this claim as follows:

> Braden contends there is insufficient evidence to support his jury's true findings on nine firearm use enhancements attached to counts 1, 3, 5, 6, 8, 9, 11, 13, and 15.
>
> "In considering a challenge to the sufficiency of the evidence to support an enhancement, we review the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence—that is, evidence that is reasonable, credible, and of solid value—from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." (*People v. Albillar* (2010) 51 Cal.4th 47, 59-60.)
>
> At issue are section 12022.53, subdivision (d) enhancements that provide for the imposition of additional consecutive sentences of 25 years to life where the accused, in the commission of specified felonies including murder, attempted murder, assault with a deadly weapon, and shooting at an inhabited dwelling, "intentionally and personally discharged a firearm and proximately caused great bodily injury ... or death, to any person other than an accomplice." Braden argues the jury had insufficient evidence to conclude his personal use of a firearm was the proximate cause of the death or great bodily injury alleged in the nine counts, because there was no direct evidence he hit any of the six named victims with the shots from his shotgun.
>
> As the People point out, in *Bland, supra,* 28 Cal.4th 313, the California Supreme Court rejected the Court of Appeal's conclusion that the section 12022.53, subdivision (d) "'enhancement cannot be found true unless defendant personally fired the bullets which struck the victim.'" (*Bland*, at p. 335.) The Court explained that "[p]roximately causing and personally inflicting harm are two different things." (*Id.* at p. 336.) The Court approved the definition of proximate cause in the CALJIC instruction given in the case: "'A proximate cause of great bodily injury or death is an act or omission that sets in motion a chain of events that produces as a direct, natural and probable consequence of the act or omission the great bodily injury or death and without which the great bodily injury or death would not have occurred.'" (*Id.* at p. 335; see also *id.* at p. 336.)
>
> In the present case, the trial court provided a different definition of proximate cause, as per CALCRIM No. 3150: "An act causes great bodily injury or death if the injury or death is the direct, natural, and probable consequence of the act and the injury or death would not have happened without the act. A natural and probable consequence is one that a reasonable person would know is likely to

happen if nothing unusual intervenes.  In deciding whether a consequence is natural and probable, consider all of the circumstances established by the evidence."  The jury was not instructed in the "chain of events" language approved in *Bland*, and the trial court did not read optional language from CALCRIM No. 3150 explaining that there may be more than one cause of injury or death.

Braden does not contend any of the trial court's instructions on proximate cause were erroneous, and he does not dispute there was sufficient evidence to support the findings on the enhancements under *Bland's* "chain of events" reasoning.  That is sufficient to defeat his claim on appeal, because the evidence was not legally insufficient to support the true findings on the enhancements.  Braden, however, seeks to benefit from the trial court's failure to give the "chain of events" or multiple causation instructions, and argues there was no evidence the injuries and death were "the direct, natural, and probable consequence" of his actions, which is the definition the jury actually received.  But Braden has not shown the definition of proximate cause in CALCRIM No. 3150 is legally different from the definition approved in *Bland, supra*, 28 Cal.4th at pp. 335-336.  Although the language of the latter would have made it easier for the prosecution to argue proximate causation, the language of the former is broad enough to encompass "chain of events" causation and a finding of proximate cause regardless of whether there is evidence Braden fired the shots that hit the named victims.  That is, the definition of proximate cause given in the present case may have strategically disadvantaged the prosecution on the issue to a minor degree, but it did not change the legal meaning of the element in the jury charge.  Accordingly, Braden's claim fails.

People v. Lopez, 2016 WL 634651, at *26-27 (footnotes omitted).

The Due Process Clause "protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged."  In re Winship, 397 U.S. 358, 364 (1970).  A court reviewing a conviction does not determine whether it is satisfied that the evidence established guilt beyond a reasonable doubt, but rather determines whether, "after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."  Jackson v. Virginia, 443 U.S. 307, 319 (1979).  Only if no rational trier of fact could have found proof of guilt beyond a reasonable doubt may a court conclude that the evidence is insufficient.  See id. at 324.  The "prosecution need not affirmatively 'rule out every hypothesis except that of guilt,'" and the reviewing federal court "'faced with a record of historical facts that supports conflicting inferences must presume—even if it does not affirmatively appear in the record—that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution.'"  Wright v. West, 505 U.S. 277, 296-97 (1992) (quoting Jackson,

After the enactment of AEDPA, a federal habeas court must apply the standards of <u>Jackson</u> with an additional layer of deference.  <u>Juan H. v. Allen</u>, 408 F.3d 1262, 1274 (9th Cir. 2005).  Generally, a federal habeas court must ask whether the operative state court decision reflected an unreasonable application of <u>Jackson</u> and <u>Winship</u> to the facts of the case.  <u>Id.</u> at 1275.

"<u>Jackson</u> leaves juries broad discretion in deciding what inferences to draw from the evidence presented at trial, requiring only that jurors 'draw reasonable inferences from basic facts to ultimate facts.'"  <u>Coleman v. Johnson</u>, 566 U.S. 650, 655 (2012) (per curiam) (quoting <u>Jackson</u>, 443 U.S. at 319).  "[O]n habeas review, a federal court may not overturn a state court decision rejecting a sufficiency of the evidence challenge" unless "the state court decision was objectively unreasonable."  <u>Id.</u> at 651 (internal quotation marks omitted).  The <u>Jackson</u> standard is applied to a crime as that crime is defined by state law.  <u>Jackson</u>, 443 U.S. at 324 n.16.

Based on a review of the record, and applying these legal principles to petitioner's current allegations, the state court's rejection of this claim was not contrary to, and did not involve an unreasonable application of, Supreme Court precedent, and was not based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.  28 U.S.C. § 2254(d).  Petitioner's claim fails at the outset because he concedes the sufficiency of the evidence supporting the firearm enhancements had the trial court instructed the jury with CALJIC No. 17.19.5, which is the current standard instruction regarding the California Penal Code section 12022.53(d) firearm enhancement.  <u>See</u> ECF No. 1 at 26-27.  In any event, the California Court of Appeal reasonably found that the instruction given in petitioner's case encompassed the standard for proximate causation and that—to the extent there was any difference—the instruction given here only worked to petitioner's benefit by giving the jury a narrower definition of proximate cause.  Finally, there was sufficient evidence for a reasonable jury to find that petitioner personally discharged a firearm.  Stone saw petitioner firing multiple times, appearing to aim before each shot.  Ex. 3 at 2544 (ECF No. 18-20 52-).  Petitioner told Loyd that he "blasted Rapp's little boy and the other motherfuckers that had it coming . . . ."  Ex. 3 at 2123 (ECF No. 18-18 at 154).  Moreover, as discussed above, there was strong evidence that petitioner had armed

himself at Athas's place, threatened to kill the Sparks partygoers, and showed a consciousness of guilt after the shooting. Mindful of the "sharply limited nature of constitutional sufficiency review" and applying the "additional layer of deference" required by AEDPA, this Court is unable to find that the California court's rejection of this claim was objectively unreasonable. Juan H., 408 F.3d at 1274-75; see also Jackson, 443 U.S. at 319, 326.

Accordingly, petitioner is not entitled to habeas relief on this claim.

## IV.    CONCLUSION

For the reasons stated above, the petition for a writ of habeas corpus is DENIED.

Pursuant to Rule 11 of the Rules Governing Section 2254 Cases, a certificate of appealability ("COA") under 28 U.S.C. § 2253(c) is GRANTED as to petitioner's claim that the instruction on the "kill zone" theory of attempted murder was erroneous. The Court finds that reasonable jurists viewing the record could find the Court's assessment of this claim "debatable or wrong." Slack v. McDaniel, 529 U.S. 473, 484 (2000). Because petitioner has failed to make a substantial showing that any of his other claims amounted to a denial of his constitutional rights or demonstrate that a reasonable jurist would disagree with this Court's assessment, a COA is DENIED as to all other claims. The COA on petitioner's "kill zone" claim does not obviate the requirement that petitioner file a notice of appeal within thirty (30) days of this order.

The Clerk shall enter judgment in favor of respondent and close the file.

**IT IS SO ORDERED.**

Dated: June 18, 2018

_____
JON S. TIGAR
United States District Judge